**MEARS TRANSPORTATION GROUP, INC., Plaintiff,**

v.

**ZURICH AMERICAN INSURANCE COMPANY, Defendant.**

**Case No. 6:08–cv–1359–Orl–22GJK.**

United States District Court, M.D. Florida, Orlando Division.

Aug. 27, 2009.

Marilyn G. Moran, Scott E. Damon, Baker & Hostetler, LLP, Orlando, FL, for Plaintiff.

Louis Schulman, R. Steven Rawls, Butler Pappas, LLP, Tampa, FL, for Defendant.

## ORDER

ANNE C. CONWAY, District Judge.

This cause comes before the Court for consideration of cross motions for summary judgment. Defendant Zurich American Insurance Co. ("Zurich") filed its motion for summary judgment (Doc. No. 22) on April 23, 2009, and Plaintiff Mears

Transportation Group, Inc. ("Mears") filed its motion for summary judgment (Doc. No. 23) on April 28, 2009. Mears filed its response in opposition to Zurich's motion (Doc. No. 27) on May 26, 2009, and Zurich filed its response in opposition to Mears' motion (Doc. No. 28) on May 28, 2009. Both motions are now ripe for adjudication.

## I. INTRODUCTION AND BACKGROUND

This case arises over a dispute regarding coverage provided by an insurance policy issued by Zurich to Mears. The parties do not dispute that the insurance policy provides coverage for costs incurred by Mears for environmental cleanup operations. Instead, the parties dispute whether the insurance policy provides coverage for costs incurred by Mears when it relocated its business operations during the cleanup process. The parties have stipulated and agreed to the following statement of undisputed facts:

1. Mears is in the transportation business and operates more than 950 vehicles, including taxi cabs, shuttle vans, motor coaches, and limousines. Mears' headquarters is located at 324 West Gore Street in Orlando, Florida, and comprises a number of different buildings. The M–4 Building contains the offices of Mears' business operations, housing the employees who perform Mears' dispatch operations and administrative functions.

2. Zurich writes various types of insurance coverage, including specialized environmental policies. Zurich is a New York corporation licensed and authorized to sell insurance in the State of Florida.

3. Mears has underground storage tanks (the "Tanks") and petroleum fuel systems on its property. To protect itself from potential liability and damages arising from possible leakage from the Tanks, Mears purchased an environmental insurance policy from Zurich.

4. On or about August 15, 2001, Zurich issued a "Storage Tank System Third Party Liability And Cleanup Policy," policy number USC 9270761, to Mears (the "Policy"). A true and correct copy of the Policy is attached as Exhibit A. This policy was a renewal of prior policies.

5. The policies issued by Zurich contain the following pertinent provisions:

I. INSURING AGREEMENT

COVERAGE A—FIRST PARTY CLEANUP DISCOVERY

We will pay on behalf of the "insured" any "cleanup costs" required by "governmental authority" as a result of a "release(s)" that "emanates from" a "scheduled storage tank system(s)" at a "scheduled location"[,] that commences on or after the "retroactive date" and is first discovered by the "insured" during the "policy period"[,] provided the "claim" is reported to us during the "policy period"[,] or any applicable extended reporting period. Coverage for "claim(s)" due to changes in "governmental authority" during any applicable extended reporting period is set out in EXTENDED REPORTING PERIODS (Section V).

II. DEFINITIONS

. . . .

F. "Cleanup costs" means

1. the necessary expenses incurred in the investigation, removal, remediation, neutralization or immobilization of contaminated soil, surface water, ground water, or other contamination

IV. EXCLUSIONS

This insurance does not apply to "claim(s),["] "cleanup costs" or "loss(es)" based upon or arising out of

. . . .

L. any costs for the reconstruction, repair, removal, maintenance, replacement, upgrading, or rebuilding of any "scheduled storage tank system," personal property, fixtures, buildings or any other improvements and any site enhancement or routine maintenance on, within, or under the "schedule location(s)"

. . . .

## VIII. CONDITIONS

F. CHOICE OF LAW In the event an "insured" and we dispute the meaning, interpretation or operation of any term, condition, definition or provision of this policy, resulting in litigation, arbitration or other form of dispute resolution, the "insured" and we agree that the law of the State of New York shall apply without giving effect to any conflicts or choice of law principles.

6. In or about the period beginning 1999 and ending 2001, petroleum fuel leaked from the Tanks insured by Zurich at the Mears property located at 324 West Gore Street in Orlando, Florida.

7. Thereafter, in or about March 2007, Mears began arranging for the removal of soil contaminated by the leak from the Tanks and remediation of the contamination.

8. In or about April 2007, Mears began excavation and remediation work on the property.

9. The Orange County Building Code and the Orange County Fire Code and other applicable laws required Mears to evacuate the personnel in the M–4 Building during the remediation and excavation efforts.

10. The removal and remediation of contaminated soil from Mears' property raised a number of health and safety concerns for the personnel who occupied the M–4 Building, including, but not limited to, the threat of soil vapors and fumes, vibrations due to sheet piling installation and removal, and the fire hazards caused by the closure of the M–4 East Building entrance. Thus, the cleanup process could not have been accomplished safely, or in accordance with applicable safety regulations, without the evacuation of Mears' personnel from the M–4 Building.

11. As a result, and as part of the cleanup effort, Mears evacuated the M–4 Building, relocated the 550 employees who worked there, and set up temporary business operations at an alternate location until the soil removal and remediation was complete.

12. The evacuation of Mears' offices, equipment, and personnel was necessary and integral to completing the removal of the contaminated soil from the property in accordance with applicable government safety regulations. The relocation of its personnel to an alternate location was necessary to the continuation of Mears' business operations, which would have stopped without the relocation.

13. Prior to the evacuation and relocation of Mears personnel, representatives of Mears discussed the need to evacuate Mears personnel from the M–4 Building with various consultants, and determined that no alternative was feasible.

14. In accordance with the terms of the Policy, Mears submitted itemized claims for expenses incurred during the cleanup process, including a claim in the amount of $153,501.79 for expenses Mears incurred to evacuate and relocate

its personnel from the M–4 Building and reestablish operations at an alternate location.

15. Zurich has paid $431,035.85 of the claims submitted by Mears, but has declined coverage and refused to pay the $153,501.79 in expenses Mears incurred to evacuate and relocate its personnel from the M–4 Building while the cleanup was ongoing.

16. It is undisputed that Mears incurred $153,501.79 in expenses in evacuating and relocating its personnel.

17. The only dispute in this litigation is whether the policy provided by Zurich provides coverage for the evacuation and relocation expenses incurred by Mears.

18. On July 7, 2008, Mears filed suit in the Ninth Judicial Circuit in and for Orange County, Florida, seeking a Declaratory Judgment on the issue of insurance coverage and asserting a claim for Breach of Contract. [Doc. No. 2]. Zurich subsequently removed the case to this Court on August 6, 2008, [Doc. No. 1], and filed its Answer and Defenses on August 20, 2008 [Doc. No. 5].

19. Mears and Zurich have stipulated that the facts in this case are undisputed and that the issue of coverage presents a question of law that is ripe for determination by this Court.

(Doc. No. 22 pp. 3–6.)

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the parties agree that no issue of fact remains, the court nonetheless considers the evidence and all inferences drawn therefrom

in the light most favorable to the non-moving party. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993). This standard is not altered by cross motions for summary judgment, as the court treats each motion separately. *See Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co.*, 541 F.Supp.2d 1295, 1297 (M.D.Fla.2008).

## III. ANALYSIS

A. *Whether Mears' Relocation Expenses are "Cleanup Costs" as Defined by the Policy*

■ The parties dispute whether the Policy's definition of cleanup costs encompasses the expenses incurred by Mears when it relocated its operations from the M–4 Building. Zurich asserts that the Policy's definition of the term "cleanup costs" is unambiguous and applies only to the "necessary expenses incurred in ... remediation ... of contaminated soil." (Doc. No. 22 p. 9.) Zurich cites the Policy's use of the phrase "incurred in" as opposed to the phrase "arising out of," and argues that the phrase "incurred in" narrowly limits the scope of the Policy's coverage to "costs that are actually incurred to conduct the physical operations" of remediating contaminated soil, not indirect expenses of remediation, such as relocation. (*Id.* at 10–11.) Zurich relies on *Theroux v. Reilly*, 1 N.Y.3d 232, 771 N.Y.S.2d 43, 803 N.E.2d 364 (2003), for the proposition that "incurred in" is not ambiguous and has a narrow meaning. (*Id.* at 9.)

Mears asserts that the Policy's definition of "cleanup costs" unambiguously covers its relocation expenses. (Doc. No. 23 pp. 7–8.) Mears contends that its relocation expenses were necessarily incurred during the removal and remediation of contaminated soil from its premises because the cleanup process "rendered the M–4 Build-

ing unsafe and mandated an evacuation under the County's Building Code and Fire Code." (*Id.* at 8.) Because the Policy broadly defines "cleanup costs," Mears argues that the Court should find that the term unambiguously covers its relocation expenses. (*Id.* at 11.) Mears further argues that even if the Court finds that the term "cleanup costs" is ambiguous, it should construe the term broadly in favor of Mears and against Zurich. (*Id.* at 12.)

 The parties agree that this matter is governed by New York law. (Doc. No. 22 p. 7; Doc. No. 23 p. 7.) Under New York law, courts first consider the language of an insurance policy to resolve a dispute over its coverage. *Consol. Edison Co. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687, 693 (2002). "As with any contract, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning." *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 848 N.Y.S.2d 603, 878 N.E.2d 1019, 1021 (2007). A contract provision is unambiguous if it uses language that has "a definite and precise meaning, unattended by danger of misconception …, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170–71 (2002)). If the provision is "reasonably susceptible of only one meaning," then "a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Id.* However, if the language of a provision is ambiguous, then "any ambiguity must be construed in favor of the insured and against the insurer." *Id.*

The Court agrees with Mears and finds that the Policy's definition of "cleanup costs" is unambiguous and is sufficiently broad to cover Mears' relocation expenses. As recited in the statement of facts, the term "cleanup costs" includes "the neces-sary expenses incurred in the investigation, removal, remediation, neutralization or immobilization of contaminated soil, surface water, groundwater, or other contamination." (*See* Doc. No. 22 Ex. A § II(F).) Mears incurred its relocation expenses as a result of the remediation of contaminated soil from the area adjacent to the M–4 Building. If Mears had not relocated its personnel from the M–4 Building, then it would not have been able to remedy the contaminated soil without violating the safety and health regulations of the Orange County Building Code and the Orange County Fire Code. Thus, the remediation of the contaminated soil caused Mears to incur relocation expenses.

Zurich relies on *Theroux* for the proposition that "incurred in" is not ambiguous under New York law and has a narrow meaning that encompasses only those cleanup costs related to the physical removal and remediation of the contaminated soil. (Doc. No. 22 pp. 8–10.) In *Theroux*, the New York Court of Appeals considered whether a police officer had to satisfy a "heightened risk" standard to qualify for benefits under a state statute that provided full wages to municipal employees injured "in the performance of" their duties. 771 N.Y.S.2d 43, 803 N.E.2d. at 365–66. In that case, the municipal respondents argued that the statute's "in the performance of" language restricted eligibility to employees who could demonstrate that their injury was substantially related to their job duties. *Id.*, 771 N.Y.S.2d 43, 803 N.E.2d at 367–69. The respondents relied on *Matter of Balcerak v. County of Nassau*, 94 N.Y.2d 253, 701 N.Y.S.2d 700, 723 N.E.2d 555 (1999), for the proposition that coverage applied only to injuries incurred in the performance of official police duties, not to injuries that arose out of the officer's employment generally, such as playing on a department basketball team. *Id.*

The *Theroux* court, however, rejected the respondents' argument and held that the statute did not impose a "heightened risk" standard. *Id.*, 771 N.Y.S.2d 43, 803 N.E.2d at 369.

Thus, Zurich's reliance on *Theroux* for the proposition that New York courts recognize "a distinction between expenses for injuries incurred in the course of employment, as opposed to expenses 'arising out of' employment" is wholly misplaced. First, the distinction described by Zurich is one that municipalities had inferred from the New York Court of Appeals decision in *Balcerak*, and was not the holding of *Theroux*. Second, the *Theroux* court stated that *Balcerak* did not stand for that distinction because, in *Balcerak*, the court "did not set out to interpret the phrase 'in the performance of' " under the state statute. *Id.*, 771 N.Y.S.2d 43, 803 N.E.2d at 369. Finally, the *Theroux* court explicitly *rejected* that distinction, holding that the language of the state statute "manifestly does not restrict eligibility for its benefits in the manner advocated by the municipal respondents." *Id.* Instead, the court held that "the covered municipal employee need only prove a direct causal relationship between [his] job duties and the resulting illness or injury." *Id.* To the extent *Theroux* is analogous to this case, it suggests that under the Policy's definition of cleanup costs, Mears need only prove a direct causal relationship between the cleanup process and the expenses it incurred. Without the cleanup, Mears would never have incurred its relocation expenses. Thus, Mears has clearly established that relationship.[1]

## B. Whether Mears' Relocation Expenses Were Required by Governmental Authority

■ Although Mears' relocation expenses are cleanup costs, Zurich argues that those expenses are not covered under the Policy because the relocation expenses were not required by a "governmental authority," as that term is used in the Policy. (Doc. No. 22 pp. 12–16.) Zurich draws a distinction between first party coverage—at issue in this case—and third party coverage, which is also provided in the Policy. (*Id.*) Zurich asserts that the Policy would require it to pay necessary relocation expenses incurred by a third party because federal and state statutes and regulations would require Mears to pay those expenses as part of a voluntary cleanup program. (*Id.*; Doc. No. 28 p. 6.) Regarding first party coverage, however, Zurich asserts that the Policy would not require it to pay Mears' relocation expenses because no federal or state statutes require polluters to relocate after contaminating their own property. (Doc. No. 22 pp. 13, 15.) Specifically, Zurich argues that the Policy's first party coverage applies only when a governmental authority requires the in-

---

1. Zurich also relies on *M'Bride v. Marine Insurance Co.*, 7 Johns. Cas. 431 (N.Y.Sup.Ct. 1811). That case is unavailing. The *M'Bride* court held that an insurer is not liable for costs incurred by the insured to maintain a full crew on a ship that the insured abandoned due to an embargo. 7 Johns. Cas. at 431. The court stated that such costs were not necessary to ensure the "safety and recovery" of the ship and its cargo. *Id.* (stating that the "sovereign who lays the embargo … does not claim the ship or cargo, but only detains them," and concluding that "it cannot be said that the crew remain on board to prevent an entire loss"). Zurich asserts that *M'Bride* is analogous to this case because it holds that an insured cannot recover for expenses incurred to protect its business obligations if those expenses are "not the subject of the insurance policy." (Doc. No. 22 p. 11.) Zurich's reliance on *M'Bride* is unavailing because it requires the Court to assume, as a starting point, that Mears' relocation expenses are not covered by the Policy. The Court cannot make that assumption because that is the sole question at issue in this case.

sured to incur costs as part of a voluntary cleanup program. (Doc. No. 28 pp. 6–7.) Thus, Zurich asserts that when an insured incurs costs that do not arise out of a voluntary cleanup program, those costs are not covered, even if the insured is required to incur those costs because of some other government statute, regulation, or local ordinance. (Doc. No. 22 p. 16.)

Mears does not squarely address Zurich's argument that the cleanup costs it incurred relocating its personnel were not required by a governmental authority. Mears' response assumes, however, that its relocation expenses were required by a governmental authority because the Orange County Building and Fire Codes dictated that Mears relocate its personnel during the cleanup process. (*See* Doc. No. 27 p. 4.) That is, Mears suggests that the relocation expenses are covered by the Policy because they were incurred to comply with applicable governmental safety regulations. (*Id.* at 2.)

The Court finds that Mears' relocation expenses were required by a "governmental authority." As presented in the statement of the undisputed facts, Coverage A, entitled "First Party Cleanup Discovery," provides that Zurich will compensate Mears for any "cleanup costs" required by "governmental authority" as a result of contamination from the Tanks. (Doc. No. 22 Ex. A § I.) The Policy defines "governmental authority" as follows:

> "Governmental authority" means applicable federal, state, or local statutes and regulations, orders or ordinances, including remedial action plans which (i) meet the requirements of a "voluntary cleanup program", (ii) are validly executed with all necessary regulatory entities and (iii) are negotiated with requirements no stricter than those necessary

for the current use set forth in your Application.

(*Id.* at § II(H).) In turn,

> "Voluntary cleanup program" means a program of a state of the United States which provides (i) mechanisms for the written approval of voluntary remedial action plans protective of human health or the environment and (ii) a certification or similar documentation indicating that such actions are complete.

(*Id.* at § II(T).) Zurich interprets these definitions as setting forth the requirement "that for a cost to be reimbursable, not only must it be a 'cleanup cost,' but it also must be required by a 'governmental authority' as part of a Florida 'voluntary cleanup program.'" (Doc. No. 28 p. 6.) The Court does not agree with Zurich's interpretation. The Court agrees that a cleanup cost must be required by a governmental authority, but the Policy does not require that the governmental authority impose that cost as part of a state's voluntary cleanup program.

In its response to Mears' motion for summary judgment, Zurich misquotes the Policy's definition of "governmental authority." (*Id.* at 5.) Zurich's quote includes a comma immediately after the participial phrase "including remedial action plans." (*Id.*) Zurich's comma is significant because it suggests that the three requirements that follow—regarding the voluntary cleanup program, the regulatory entities, and the negotiation requirements— modify "federal, state, or local statutes, regulations, orders or ordinances," rather than merely modifying the participial phrase. If the participial phrase is set off by commas, then the three subsequent requirements listed by the definition could be interpreted as modifying the entire list. However, the definition in the Policy attached as Exhibit A to Zurich's motion for summary judgment does not include a

comma after the participial phrase. (Doc. No. 22 Ex. A § II(H).) In the absence of Zurich's comma, the natural reading of the phrase indicates that the three requirements modify remedial action plans only, and do not apply to federal, state or local statutes, regulations, orders or ordinances. Thus, the definition merely stipulates that for a remedial action plan to qualify as a governmental authority, it must meet the requirements of a voluntary cleanup plan. The definition does not require that federal, state, or local statutes, regulations, orders, or ordinances meet the requirements of a voluntary cleanup plan.

The Court's interpretation of the Policy is buttressed by its plain meaning. Under Zurich's interpretation, governmental authority would mean any federal, state or local statute, regulation, order or ordinance that (1) meets the requirements of a "voluntary cleanup program," (2) is validly executed with all necessary regulatory entities, and (3) is negotiated with requirements no stricter than those necessary for the current use set forth in the insured's Application. This reading of the Policy is unreasonable. For example, a cleanup cost required by a federal statute would not be covered unless the federal statute met the requirements of the state's voluntary cleanup program, was validly executed with regulatory entities, and was negotiated with requirements no stricter than those set forth in the insured's application. The application of these restrictions to a federal statute or to other government statutes, regulations, and ordinances is illogical. In contrast, a reasonable construction of the Policy indicates that a cleanup cost is covered if it is required by a federal, state, or local statute or regulation, order or ordinance, or by certain remedial action plans. For a remedial action plan to qualify as a governmental authority, it must meet the requirements of a state's voluntary cleanup program, be

validly executed with all necessary regulatory entities, and be negotiated with requirements no stricter than those necessary for the current use set forth in the insured's Application. The Policy is reasonably susceptible to this interpretation.

In this case, Orange County Building and Fire Codes are local ordinances, which qualify as governmental authorities under the Policy. The local ordinances required Mears to relocate its personnel from the M–4 Building during the remediation of contaminated soil. As discussed above, Mears' relocation expenses were cleanup costs under the Policy. Accordingly, Mears' relocation expenses are covered under the Policy because a governmental authority required Mears to incur those cleanup costs.

C. *Whether the Policy Excludes Coverage for Relocation Expenses*

■ Finally, Zurich argues that even if relocation expenses are cleanup costs required by governmental authority, those expenses are nonetheless excluded under the Policy. (*Id.* at 17.) Zurich asserts that, under Exclusion L, the Policy would not pay for any costs arising out of the permanent destruction or reconstruction of the M–4 Building. (*Id.* at 16–17.) Thus, Zurich concludes that the Policy cannot reasonably be construed to provide coverage for the temporary replacement of the M–4 Building, if it would not cover the permanent replacement of that building. (*Id.* at 17–19.)

Mears argues that Exclusion L does not apply to this case. (Doc. No. 23 p. 14.) Mears asserts that its "relocation of its employees and business operations during the cleanup process cannot reasonably be described as 'removal' of 'personal property,' 'fixtures,' or 'buildings.'" (*Id.*) Moreover, Mears asserts that the exclusion is,

at a minimum, ambiguous because it does not refer to relocation expenses. (*Id.*)

The Court finds that the Policy does not exclude Mears' temporary relocation costs. An "exclusion in an insurance policy can negate coverage only where it is stated in clear and unmistakable language and is subject to no other reasonable interpretation." *RJC Realty Holding Corp. v. Republic Franklin Ins. Co.*, 2 N.Y.3d 158, 777 N.Y.S.2d 4, 808 N.E.2d 1263, 1266–67 (2004). As recited above, Exclusion L stipulates that coverage is not provided for "cleanup costs … arising out of … the reconstruction, repair, removal, maintenance, replacement, upgrading, or rebuilding of any … personal property, fixtures, buildings, or any other improvements." (Doc. No. 22 Ex. A § IV(L).) The exclusion does not mention any costs related to the temporary relocation of personnel or other equipment. Indeed, the words of the exclusion are most plausibly read to refer to the permanent rebuilding of the insured's property, not the temporary relocation of property during the cleanup process.

Moreover, Zurich acknowledges that in third-party cleanup situations, "there are instances where 'governmental authority' may require the relocation of other persons, such as impacted residents," but asserts that state and federal environmental statutes do not require the relocation of the polluting operator's business operations. (Doc. No. 28 p. 8.) Thus, Zurich was aware that relocation expenses could be considered cleanup costs in some circumstances and could have anticipated that a governmental authority, other than state or federal environmental statutes, might require a polluter to relocate its personnel during the cleanup process. Although Zurich could have specifically excluded expenses incurred by the insured to relocate its personnel, it did not. Accordingly, Mears' relocation expenses are cleanup costs not excluded by the Policy.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. Defendant Zurich American Insurance Company's Motion for Summary Judgment (Doc. No. 22), filed on April 23, 2009, is DENIED.

2. Plaintiff Mears Transportation Group, Inc.'s Motion for Summary Judgment (Doc. No. 23), filed on April 28, 2009, is GRANTED. Defendant Zurich American Insurance Company is liable under the terms of the insurance policy issued by Defendant to Plaintiff for temporary relocation expenses incurred by Plaintiff in the amount of **$153,501.79**. Defendant is also liable to Plaintiff for reasonable attorneys' fees under Fla. Stat. § 627.428.

3. This case is REFERRED to Magistrate Judge Gregory J. Kelly for a determination of the attorneys' fees to which Plaintiff Mears Transportation Group, Inc. is entitled from Defendant Zurich American Insurance Company, pursuant to Fla. Stat. § 627.428. Plaintiff shall file and serve a properly-supported fee application on or before **Wednesday, September 9, 2009**. Defendant shall file and serve its response to the fee application on or before **Wednesday, September 23, 2009.**

4. Following the determination regarding fees, the Court will direct the Clerk to enter a final judgment incorporating this ruling.

5. The trial of this case is CANCELLED.