# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 1, 2015 Session

## IN RE: ESTATE OF WARREN ELROD

**Appeal from the Chancery Court for Washington County**
**No. P2197        John C. Rambo,  Chancellor**

---

### No. E2014-02205-COA-R3-CV-FILED-SEPTEMBER 10, 2015

---

This appeal involves a non-probate asset, an individual retirement account.  The decedent's listed beneficiary on the asset predeceased him.  The biological son of the decedent moved to collect the proceeds of the asset as the sole heir at law.  Two stepchildren sought to be declared the decedent's "children" in order that they might share in the account with the biological son.  The decedent's will provided for all three individuals to share equally in his real and personal property.  The probate court found the term "children" in the retirement account agreement was ambiguous and determined the decedent considered all three individuals to be his "children."  Accordingly, the court ordered that the asset should be distributed equally to Sherry Diane Souder, Terry Ray Palmer, and Gregory Lynn Elrod as "children" of the decedent.  The biological son appeals.  We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J.,  and FRANK G. CLEMENT, JR., P.J., M.S.,  joined.

Jason A. Lee, Nashville, Tennessee, for the appellant, Gregory L. Elrod.

Mark S. Hanor, Kingsport, Tennessee, for the appellees, Sherry D. Souder and Terry R. Palmer.

## OPINION

## I. BACKGROUND

In late 1963 or early 1964, Warren L. Elrod ("Decedent") married Sally Stuebing. Gregory L. Elrod ("Son") was born to the couple in 1966. When Decedent and Ms. Stuebing divorced a few years later, Decedent was granted custody of Son. Ms. Stuebing, unhappy with the custody determination, took Son and relocated first to New York and later to California. Despite zealous attempts, Decedent was unable to obtain his son's return. Ms. Stuebing subsequently married Robert Hunter, and Son, known by the name "Gregory Hunter," lived with his mother and Mr. Hunter in California.

Meanwhile, Decedent began dating Roberta Elrod in the 1970s. They married in May 1973 and moved from Tennessee to Maryland. Decedent became actively involved in the lives of his new wife's children, Terry and Sherry. He enrolled Sherry in softball and enrolled Terry in baseball and football. He camped with the children on the weekends and went fishing with Terry.

Decedent was always "dad" for his stepchildren, and when he introduced them in public, he called them his "kids" or his "children." Decedent referred to Sherry as his "daughter" and Terry as his "son." Gregory Elrod was identified as his "biological son."

Despite making many attempts to contact Son over the years, Decedent had no relationship with him during elementary, middle, and high school except one phone call. When Son was approximately ten years old, he spoke to Decedent by phone. Decedent concluded that the call was very confusing for Son because his biological father was unknown to him and he was settled in California. Believing that it was in Son's best interest, Decedent decided to not disrupt the child's life.

In 1982, when Son was around sixteen, Decedent's ex-wife inquired by phone if Son could move east to live with him. Decedent agreed to the arrangements, but Son never arrived. The record reveals that Son apparently dropped out of school around this time. He testified that he became homeless around age 15, slept in an underground garage, and walked to school until he stopped attending. Around 1986, Decedent obtained a phone number for Son. Upon calling Son, Decedent learned that the youth had been living in northern Virginia for some time. Son was invited to visit Decedent's home and family. Son came on a Saturday afternoon for dinner and was introduced to everyone. After the visit, however, Son discouraged further contact and eventually told Decedent that he would call him when he was interested in reaching out. Approximately a year later, Son called Decedent to inform him of an address change, but he never visited again.

After Sherry married, she purchased a house across the street from the family home so she could remain close to her mother and Decedent (collectively, "Parents").

When she later relocated, she rented the home to her brother, Terry. Eventually, both stepchildren moved approximately 20 miles away, but they continued to spend the majority of their spare time, most weekends, and all holidays with Parents. When health difficulties of Parents increased, Sherry and Terry took turns caring for them, assisting with hospital visits, and taking them to medical appointments.

During the mid to late 1990s, Son contacted Decedent at various times, but they did not visit or spend much, if any, time together. In the early 2000s, Decedent learned that Son was involved in car racing in Winchester, Virginia. From approximately 2000-2009, Terry would drive Decedent to regularly watch Son race. At a hearing, Terry testified that Son was asking Decedent for money and Decedent decided that was all he wanted from him. Decedent decided to stop attending the races, but he continued to send Son and his wife birthday and Christmas cards and presents. Decedent later arranged a trip to Tennessee to introduce Son to his grandmother, aunts and uncles. After that visit, however, there was no regular contact. Whenever Son and his wife were invited to participate in family holidays, they declined every time.

On April 20, 2010, Decedent executed an IRA Adoption Agreement ("the IRA"), in which he designated his wife as the beneficiary. The IRA provides that if the designated beneficiary did not survive Decedent, the IRA would be distributed to his "children." The following year, on July 25, 2011, Mrs. Elrod died.

After his wife's death, Decedent's health began to fail more quickly. Both stepchildren requested that Decedent move into their homes, but he declined. According to Sherry, she checked on Decedent multiple times a day, took him to all of his doctor's appointments, prepared and delivered meals to him on Wednesdays and Sundays, and took him outside the home at least two other nights per week so he would remain active. Decedent continued to spend all holidays, birthdays, and vacations with Sherry or Terry and their families.

On April 3, 2012, Decedent executed his Last Will and Testament ("the Will"), in which he gave the majority of his assets, both real and personal, to Sherry, Terry, and Son in equal shares. Sherry was designated as Decedent's personal representative. He further gave Sherry his Power of Attorney and added her to his bank accounts. The Will makes no reference to the IRA.

Decedent decided to relocate from Maryland to his hometown of Johnson City, Tennessee, in November 2012. He purchased a mobile home in Tennessee in the same trailer park as his older brother, Wayne Elrod. Sherry and Terry helped Decedent clean and pack the contents of his Maryland home. Terry and his oldest son, Tyler Palmer, helped Decedent move his personal property to Johnson City. Sherry continued to talk to Decedent daily and visited him twice after his arrival in Tennessee in July 2013. Terry

spoke with Decedent between one and two times per week. Sherry also assisted Decedent in the transfer of all of his Maryland medical records.[1]

Decedent last communicated with Son in August 2013, when Son called his father to inquire if he was getting senile. Son commented to Decedent that he had not received a card or gift for his birthday. The discussion irritated Decedent, who proceeded to explain his pain and disappointment resulting from Son's lack of respect for him. Decedent informed Son that he would no longer chase him for a relationship. According to Wayne, Decedent discussed changing the Will to remove Son.

On August 27, 2013, Sherry contacted Decedent about an issue regarding his Maryland house. When Sherry noticed Decedent's labored breathing, she inquired whether he was having other difficulties such as pain or swelling in his legs. Decedent replied that he had some swelling, but stated that he did not want her to call an ambulance. Decedent promised to go to the doctor if he was not feeling better by the time his brother arrived. Sherry called Wayne to request that he visit immediately and take Decedent to the hospital. Approximately 15 minutes later, Wayne called 911. As Decedent walked to the ambulance, he suffered a heart attack.

Without returning to her home, Sherry started traveling to Tennessee as soon as she got the news. She contacted Terry, who responded that he was on his way. Son commented:

> "Well, I was just there on Wednesday with my motorcycle tour and came right past his exit, I could have stopped then had I known that he lived there. I'm back home now and have a car race in Winchester tonight. I'll be home about 11 or so; just let me know what you find."

When Sherry arrived at the hospital, Decedent was in a coma in the intensive care unit. Terry arrived a few hours later, and they stayed at the hospital until approximately 4:00 a.m. Son did not respond to Sherry's calls until late that evening, at which time he was intoxicated and unable to communicate. Sherry informed him of Decedent's condition and that she was going to meet with the cardiologist and neurologist the following afternoon. She suggested that Son come to the hospital if he wanted to spend time with Decedent while he was still alive.

As Decedent had suffered severe loss of oxygen to his brain, the neurologist notified Sherry that Decedent would not recover. She decided to remove him from life

---

[1]Wayne helped his brother establish new physicians and accompanied him to his appointments in Tennessee.

support in compliance with his wishes in his Living Will. Prior to doing so however, she called Decedent's relatives to give everyone time to arrive. Son's response to her phone call was the following: "I don't know his wishes-if you know what he wants and he don't want to be on that machine, pull the plug." According to Sherry, Son appeared very disinterested in anything she said about Decedent's condition. Rather, he began quizzing her about the whereabouts of the Will and whether Decedent lived in a nice double-wide mobile home on a nice piece of ground or whether he was renting in a trailer lot. Son also asked about the whereabouts of Decedent's vehicles and if he still owned his home in Maryland. Son later called the hospital stating "he was the only son and known heir of Warren Elrod and wanted to speak to someone in charge." The nurse asked Sherry to pick up the phone in the family waiting room and "deal" with whoever was on the line. Son was severely intoxicated and very belligerent. He informed her that he wouldn't be coming to the hospital. On September 1, 2013, Decedent died.

Son chose not to attend Decedent's funeral. However, Decedent's wishes were to be cremated and Son's signature was required for the cremation. He refused to sign the agreement for cremation without a copy of the Will and copies of the death certificate. When Sherry explained to Son that she did not have any paperwork with her as she had not returned to her Maryland home prior to driving to the hospital, he accused her of lying. Son did not provide his signature for the cremation services until the scheduled day of the funeral service.

After a Maryland court ruled in January 2014, that Decedent was domiciled in Tennessee at his death, administration of the estate was begun in Tennessee. The Will identifies Son as Decedent's "son," Terry as Decedent's "stepson," and Sherry as Decedent's "stepdaughter." The document describes Decedent's intent for Son, Sherry, and Terry to share in his real and personal property equally.

An inventory of assets was filed by Sherry on June 18, 2014. For tax filing purposes, the IRA was listed as an estate asset on the advice of the law firm for the estate. Son filed a motion to declare the IRA a non-probate asset and requested that the court enter an order declaring that Son was the only surviving child of Decedent. In response, Sherry and Terry filed a response to declare the IRA a non-probate asset and a motion to designate themselves children of Decedent. The court found the term "children" in the IRA was ambiguous and, due to Son's absence, continued the matter for an evidentiary hearing. The trial court provided:

> In this case, the Court finds that the payor, Pershing, LLC, has effectively waived its right to enforce the procedural rules for payment of the proceeds as designated for Beneficiaries within their documents. They have done this as a result of their unwillingness to proceed and pay by their interpretation and they have done nothing to affect their interpretation of

their own documents and to make payment in accordance to what they believe they are entitled to do. They are not a participant in this litigation but it is apparent for all practical purposes that they await this Court's determination before they will make a payment.

Subsequent to the execution of the documents for the designation of a beneficiary, the Decedent executed his Last Will and Testament. . . . Within the Last Will and Testament the Decedent did not . . . define what "children" means or "child" means for purposes of his Will. Further, it did not specifically deal with any IRA and designate a beneficiary specifically related to the IRA. . . . The IRA . . . was an account which he had designated his wife as the beneficiary and he made no secondary designation of a beneficiary – no overt secondary designation of a beneficiary. He failed to update his Designation of a Beneficiary under the IRA contract after his wife died.

Article Three of the Last Will and Testament is the residual clause of the Will executed by the Decedent. In it he states "I give, devise and bequeath all the rest, residue and remainder of my property (hereinafter referred to as my "residuary estate"), both real and personal wheresoever situate, absolutely and in fee simple, whether now – or hereafter acquired by me, to my son, GREGORY LYNN ELROD, my stepson, TERRY RAY PALMER, and my stepdaughter, SHERRY DIANE SOUDER, in equal shares per stirpes, share and share alike." Further, he appoints his . . . stepdaughter as his personal representative or executor. In the event of her failure to qualify, for whatever reason, Terry Ray Palmer and Gregory Lynn Elrod were designated as alternate co-personal representatives.

In a variety of context, "children" can mean different things. Of course, the first and traditional definition of "children" was issue, a child, a son or daughter born of that person. Over time most states, if not all, have broadened that definition to include an adoptive child and the adoptive child henceforth means "child for most purposes, especially and specifically for intestate purposes."

This issue before the Court does not turn on New York's definition of "issue" or "child" or "intestate purposes." That definition is provided by New York state specifically. What the Court has to look at is what does "children" mean within the context of this IRA beneficiary, this 24-page document.

This document was not a creation of a negotiation between the Decedent and Pershing. This was standard document, you sign it and you get what comes with it in accordance to what Pershing believes its documents mean and []as they have defined it. In the laws of New York relating to worker's compensation they have provided a definition of "child" that includes a stepchild or a child born out of wedlock among other definitions, certainly broader than "issue."

The Court finds that the term "children" in the IRA documents is ambiguous and can be defined as to what the intent of the Decedent was, if it can be determined. Since the payor has waived compliance with procedural rules, the Court will exercise equity and seek to do what the Decedent apparently intended and award the funds in the IRA to the claimants having the strongest claim under existing conditions. The strongest evidence of the Decedent's intent in how he treated these three individuals is found in how he designated the natural bounty from him. He did not designate his biological son, Gregory Lynn Elrod, to be his beneficiary to the exclusion of his two stepchildren. The son, Gregory Lynn Elrod, the stepson, Terry Ray Palmer, and . . . stepdaughter, Sherry Diane Souder were to ". . . share per stirpes, share and share alike, equal shares."

It is readily apparent that it was [Decedent's] expressed intention in his Will that the three would be treated equal and would share and share alike. That is sum evidenced.

The evidentiary hearing with Son participating was conducted on September 17, 2014. After the hearing, the trial court orally observed, inter alia, as follows:

The Court interprets Warren Elrod's intentions that the three would be, were his children. That was what he meant by "children" was that these three and that his failure to make any changes on documents from his IRA that purged them,

- 7 -

the Court believes and credits the testimony that he simply avoided, and he acknowledged that he was avoiding, removing the name of a person who was most close to him, his wife, from legal documents. It was just simply too hard. And that he also labored under the assumption that his Will, where he treated them all three the same, trumped all. That's the judgment of the Court.

A judgment was entered on October 7, 2014:

a. That the term "children" as used by Warren Elrod means: Sherry Diane Souder, Terry Ray Palmer, and Gregory Lynn Elrod;

b. That the proper beneficiaries of the IRA bearing account number J2l-007916-E65 with Capital One Financial Advisers as the broker/dealer and Pershing, LLC as the custodian are: Sherry Diane Souder, Terry Ray Palmer, and Gregory Lynn Elrod; and

c. That the IRA should be distributed equally to Sherry Diane Souder, Terry Ray Palmer, and Gregory Lynn Elrod.

An amended judgment was filed on November 3, 2014, including the same verbatim ruling but additionally ordering that the "[j]udgment shall be considered final under Tenn. R. Civ. Pro. 54.02 for the issues determined in the Judgment." Son timely filed this appeal.

## II. ISSUES:

The issues raised by the parties in this appeal are restated as follows:

1. Whether the Probate Court erred in finding the term "children" was ambiguous in the contract?

2. Whether the Probate Court erred in finding the proper beneficiaries of the IRA are Sherry Diane Souder, Terry Ray Palmer, and Gregory Lynn Elrod.

## III.  STANDARD OF REVIEW

This case was ruled on by the trial court sitting without a jury.  As to the findings of fact, the standard of review is de novo upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise.  Tenn. R. App. P. 13(d).  To the extent questions of law are presented, the resolution of those issues is to be reviewed de novo with no presumption of correctness.  *Bowden v. Ward*, 27 S. W. 3d 913, 916 (Tenn. 2000).

## IV. DISCUSSION

In New York, "[t]he rules governing the construction of an ambiguous contract are not triggered unless the court first finds an ambiguity."  *Marfurt v. College Park Assocs.*, 643 N.Y. S. 2d 266, 266 (N.Y. Sup. Ct. 1996).

It is well settled that "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent . . . , and [t]he best evidence of what the parties . . . intend is what they say in their writing."  *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (N.Y. 2002) (internal quotation marks omitted). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.; see Hall v. Paez*, 77 A.D.3d 620, 621, 909 N.Y.S.2d 105 (N.Y. 2010).  Therefore, courts may consider extrinsic or parol evidence of the parties' intent only if the contract is ambiguous.  *See Boster-Burton v. Burton*, 73 A.D.3d 671, 673, 900 N.Y.S.2d 375 (N.Y. 2010).  In determining whether a contract is ambiguous, a court considers whether the contract "on its face is reasonably susceptible of more than one interpretation." *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (N.Y. 1986); *see St. Mary v. Paul Smith's Coll. of Arts & Sciences*, 247 A.D.2d 859, 859, 668 N.Y.S.2d 813 (N.Y.A.D. 1998).

Under New York law, whether the language in a written contract such as the IRA is ambiguous is a question of law for the trial court.  *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (N.Y. 1999).  An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. *Fox Film Corp. v. Springer*, 273 N.Y. 434 (N.Y. 1937); *Rochester Park, Inc. v. City of Rochester*, 19 A.D.2d 776  (N.Y.A.D. 4th Dept. 1963).  When the relevant language has a definite and precise meaning, unattended by danger or misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion, no ambiguity exists.  *Breed v. Insurance Co. of North Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978).

Son asserts that the term "children" in the IRA is not ambiguous and that no parol evidence should be admitted for consideration. He argues that the presence or lack of ambiguity is significant because it impacts the approach taken in the court's review. According to Son, the IRA proceeds must be distributed solely to him as Decedent's only natural child and consideration of Decedent's Will and other testimony concerning relationships with Decedent was improper. Additionally, he contends that because the IRA is a non-probate asset, it is improper to construe the IRA in conjunction with the Will.

As noted above, if a court determines that a contract is ambiguous, the court may consider parole evidence to clarify its meaning. In this case, the term "children" is ambiguous, as it is susceptible to more than one meaning to a reasonably prudent person as evidenced by the varying definitions among dictionaries, New York statutes, and Tennessee statutes. The dictionary definitions do not specifically include or exclude stepchildren within the meaning of "children." At least one New York statute specifically includes stepchildren within the meaning of "children," while one Tennessee statute specifically excludes stepchildren within the meaning of "children."

Decedent referred to Sherry, Terry, and Son as his children. He did not place any emphasis on Sherry or Terry being his stepchildren in regular conversation. Any emphasis that Decedent placed in describing his children was that Son was his biological child. Under the facts of this case, the argument could be made that the term "children" more properly described Sherry and Terry than Son, but that assertion is not before us.

Having considered the varying definitions of "children" and the testimony of all the witnesses, the court correctly determined that the term "children" in the IRA agreement meant Sherry Diane Souder, Terry Ray Palmer, and Gregory Lynn Elrod. Accordingly, the court properly found them to be the beneficiaries of the IRA.

## V. CONCLUSION

The decision of the Probate Court is affirmed, and the case is remanded to the trial court for any further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Gregory L. Elrod.

_____
JOHN W. McCLARTY, JUDGE

- 10 -