OPINION OF THE COURT
 

 Graffeo, J.
 

 In this contract dispute between a singing group and their record producer, we must determine whether the artists’ transfer of full ownership rights to the master recordings of musical performances carried with it the unconditional right of the producer to redistribute those performances in any technological format. In the absence of an explicit contractual reservation of rights by the artists, we conclude that it did.
 

 In the early 1960s, Veronica Bennett (now known as Ronnie Greenfield), her sister Estelle Bennett and their cousin Nedra Talley, formed a singing group known as “The Ronettes.” They met defendant Phil Spector, a music producer and composer, in 1963 and signed a five-year “personal services” music recording contract (the Ronettes agreement) with Spector’s production company, defendant Philles Records, Inc. The plaintiffs agreed to perform exclusively for Philles Records and in exchange, Philles Records acquired an ownership right to the recordings
 
 *567
 
 of the Ronettes’ musical performances.
 
 [1]
 
 The agreement also set forth a royalty schedule to compensate plaintiffs for their services. After signing with Philles Records, plaintiffs received a single collective cash advance of approximately $15,000.
 

 The Ronettes recorded several dozen songs for Philles Records, including “Be My Baby,” which sold over a million copies and topped the music charts. Despite their popularity, the group disbanded in 1967 and Philles Records eventually went out of business. Other than their initial advance, plaintiffs received no royalty payments from Philles Records.
 

 Beyond their professional relationship, however, was the story of the personal relationship between Spector and plaintiff Ronnie Greenfield. They married in 1968 but separated after a few years. Greenfield initiated a divorce proceeding against Spector in California and a settlement was reached in 1974. As part of that agreement, Spector and Greenfield executed mutual general releases that purported to resolve all past and future claims and obligations that existed between them, as well as between Greenfield and Spector’s companies.
 

 Defendants subsequently began to capitalize on a resurgence of public interest in 1960s music by making use of new recording technologies and licensing master recordings of the Ronettes’ vocal performances for use in movie and television productions, a process known in entertainment industry parlance as “synchronization.” The most notable example was defendants’ licensing of “Be My Baby” in 1987 for use in the motion picture “Dirty Dancing.” Defendants also licensed master recordings to third parties for production and distribution in the United States (referred to as domestic redistribution), and sold compilation albums containing performances by the Ronettes. While defendants earned considerable compensation from such licensing and sales, no royalties were paid to any of the plaintiffs.
 

 As a result, plaintiffs commenced this breach of contract action in 1987, alleging that the 1963 agreement did not provide Philles Records with the right to license the master recordings for synchronization and domestic redistribution, and demanded royalties from the sales of compilation albums. Although defendants initially denied the existence of a contract, in 1992
 
 *568
 
 they stipulated that an unexecuted copy of the contract would determine the parties’ rights. Defendants thereafter argued that the agreement granted them absolute ownership rights to the master recordings and permitted the use of the recordings in any format, subject only to royalty rights. Following extensive pretrial proceedings (160 AD2d 458; 243 AD2d 353; 248 AD2d 212), Supreme Court ruled in plaintiffs’ favor and awarded approximately $3 million in damages and interest.
 

 The Appellate Division affirmed, concluding that defendants’ actions were not authorized by the agreement with plaintiffs because the contract did not specifically transfer the right to issue synchronization and third-party domestic distribution licenses. Permitting plaintiffs to assert a claim for unjust enrichment, the Court found that plaintiffs were entitled to the music recording industry’s standard 50% royalty rate for income derived from synchronization and third-party licensing. We granted leave to appeal.
 

 We are asked on this appeal to determine whether defendants, as the owners of the master recordings of plaintiffs’ vocal performances, acquired the contractual right to issue licenses to third parties to use the recordings in connection with television, movies and domestic audio distribution.
 
 [2]
 
 The agreement between the parties consists of a two-page document, which apparently was widely used in the 1960s by music producers signing new artists. Plaintiffs executed the contract without the benefit of counsel. The parties’ immediate objective was to record and market the Ronettes’ vocal performances and “mak[e] therefrom phonograph records and/or tape recordings and other similar devices (excluding transcriptions).”
 
 [3]
 
 The ownership rights provision of the contract provides:
 

 “All recordings made hereunder and all records and reproductions made therefrom together with the performances embodied therein, shall be entirely [Philles’] property, free of any claims whatsoever by you or any person deriving any rights of interest from you. Without limitation of the foregoing, [Philles] shall have the right to make phonograph records, tape recordings or other reproductions of
 
 *569
 
 the performances embodied in such recordings by any method now or hereafter known, and to sell and deal in the same under any trade mark or trade names or labels designated by us, or we may at our election refrain therefrom.”
 

 Plaintiffs concede that the contract unambiguously gives defendants unconditional ownership rights to the master recordings, but contend that the agreement does not bestow the right to exploit those recordings in new markets or mediums since the document is silent on those topics. Defendants counter that the absence of specific references to synchronization and domestic licensing is irrelevant. They argue that where a contract grants full ownership rights to a musical performance or composition, the only restrictions upon the owner’s right to use that property are those explicitly enumerated by the grantor/artist.
 

 Despite the technological innovations that continue to revolutionize the recording industry, long-settled common-law contract rules still govern the interpretation of agreements between artists and their record producers.
 
 [4]
 
 The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties’ intent
 
 (see Slatt v Slatt,
 
 64 NY2d 966, 967,
 
 rearg denied
 
 65 NY2d 785 [1985]). “The best evidence of what parties to a written agreement intend is what they say in their writing”
 
 (Slamow v Del Col,
 
 79 NY2d 1016, 1018 [1992]). Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms
 
 (see e.g. R/S Assoc. v New York Job Dev. Auth.,
 
 98 NY2d 29, 32,
 
 rearg denied
 
 98 NY2d 693 [2002]; W.W.W.
 
 Assoc. v Giancontieri,
 
 77 NY2d 157, 162 [1990]).
 

 Extrinsic evidence of the parties’ intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide
 
 (see
 
 W.W.W.
 
 Assoc. v Giancontieri, supra
 
 at 162). A contract is unambiguous if the language it uses has “a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion”
 
 (Breed v Insurance Co. of N. Am.,
 
 46 NY2d 351, 355 [1978],
 
 rearg denied
 
 46 NY2d 940 [1979]). Thus, if the agree
 
 *570
 
 ment on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and. equity
 
 (see e.g. Teichman v Community Hosp. of W. Suffolk,
 
 87 NY2d 514, 520 [1996];
 
 First Natl. Stores v Yellowstone Shopping Ctr.,
 
 21 NY2d 630, 638,
 
 rearg denied
 
 22 NY2d 827 [1968]).
 

 The pivotal issue in this case is whether defendants are prohibited from using the master recordings for synchronization, and whatever future formats evolve from new technologies, in the absence of explicit contract language authorizing such uses. Stated another way, does the contract’s silence on synchronization and domestic licensing create an ambiguity which opens the door to the admissibility of extrinsic evidence to determine the intent of the parties? We conclude that it does not and, because there is no ambiguity in the terms of the Ronettes agreement, defendants are entitled to exercise complete ownership rights, subject to payment of applicable royalties due plaintiffs.
 

 New York has well-established precedent on the issue of whether a grantor retains any rights to artistic property once it is unconditionally transferred. In
 
 Pushman v New York Graphic Socy.
 
 (287 NY 302 [1942]), for example, this Court considered whether the common law permitted an artist who unconditionally sold a painting to enjoin the owner from making reproductions of the artwork. Citing numerous authorities for the proposition that the unconditional sale of a work of art transfers all property rights to the buyer, we held that the defendants could reproduce the painting because “an artist must, if he wishes to retain or protect the reproduction right, make some reservation of that right when he sells the painting”
 
 (id.
 
 at 308). A broad grant of ownership rights, coupled with the absence of a reservation clause, was similarly dispositive in
 
 Burnett v Warner Bros. Pictures
 
 (67 NY2d 912 [1986],
 
 affg
 
 113 AD2d 710). In that case, the plaintiffs had assigned all of their rights in a play that was later adapted into a movie, “Casablanca,” and subsequently led to the defendant’s spinoff television series. We affirmed the Appellate Division’s conclusion that if “the plaintiff intended to retain certain rights, specific clauses to that effect should have been included in the agreement” because the parties’ contract assigned “all imaginable rights” to Warner Brothers (113 AD2d at 712-713).
 

 In analogous contexts, other courts have recognized that broad contractual provisions, similar to those in the Ronettes agreement, convey virtually unfettered reproduction rights to
 
 *571
 
 license holders in the absence of specific exceptions to the contrary. In
 
 Boosey & Hawkes Music Publs., Ltd. v Walt Disney Co.
 
 (145 F3d 481 [2d Cir 1998]), the plaintiff granted distribution rights in foreign countries to Igor Stravinsky’s musical composition “The Rite of Spring,” including the “right, license, privilege and authority to record [the composition] in any manner, medium or form”
 
 (id.
 
 at 484) for use in the motion picture “Fantasia” to the Walt Disney Company. After Disney reproduced the song in videocassette and laser disc versions for foreign distribution, the plaintiff sought breach of contract damages on the basis that the agreement did not explicitly provide for distribution in new technological mediums.
 

 The United States Court of Appeals for the Second Circuit reiterated its precedent that “ ‘licensee [s] may properly pursue any uses which may reasonably be said to fall within the medium as described in the license’ ”
 
 (id.
 
 at 486, quoting
 
 Bartsch v Metro-Goldwyn-Mayer, Inc.,
 
 391 F2d 150, 155 [2d Cir],
 
 cert denied
 
 393 US 826 [1968]). As applied to the facts of
 
 Boosey,
 
 the Second Circuit concluded that the broad language employed in the contract granted Disney the authority to use the musical composition in the videocassette version of the movie in the absence of any contractual indication otherwise.
 
 [5]
 
 Thus, the language of the contract was the controlling factor in interpreting the agreement:
 

 “If the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation” (145 F3d at 487).
 

 
 *572
 
 We agree with these prevalent rules of contract construction — the unconditional transfer of ownership rights to a work of art includes the right to use the work in any manner
 
 (see generally Pushman,
 
 287 NY at 308) unless those rights are specifically limited by the terms of the contract
 
 (see Burnett,
 
 67 NY2d 912;
 
 Boosey & Hawkes Music Publs.,
 
 145 F3d at 486-487;
 
 see generally, Hellman v Samuel Goldwyn Prods.,
 
 26 NY2d 175 [1970]). However, if a contract grants less than full ownership or specifies only certain rights to use the property, then other, unenumerated rights may be retained by the grantor
 
 (see e.g., Warner Bros. Pictures v Columbia Broadcasting Sys.,
 
 216 F2d 945, 948 [9th Cir 1954],
 
 cert denied
 
 348 US 971 [1955];
 
 see generally Cohen v Paramount Pictures Corp.,
 
 845 F2d 851 [9th Cir 1988]).
 

 In this case, plaintiffs concede that defendants own the master recordings. Notably, the agreement explicitly refers to defendants’ “right to make phonograph records, tape recordings or
 
 other reproductions
 
 of the performances embodied in such recordings by
 
 any method now or hereafter known,
 
 and to sell and deal in the same” (emphasis added). Plaintiffs contend that the breadth of the ownership provision is limited by the agreement’s introductory paragraph, which states that defendants’ purpose for purchasing plaintiffs’ performances was to make “phonograph records and/or tape recordings and other similar devices.” However, when read in conjunction with the ownership provision, a reasonable meaning emerges — the phrase “other similar devices” refers to defendants’ right to reproduce the performances by any current or future technological methods. We also reject plaintiffs’ assertion that the royalty schedule restricts the scope of defendants’ ownership rights. That section of the agreement provides compensation rights to plaintiffs; it does not inhibit defendants’ ability to use the master recordings. We therefore hold that the Ronettes agreement, “read as a whole to determine its purpose and intent” (W.W.W.
 
 Assoc. v Giancontieri,
 
 77 NY2d at 162), is susceptible to only one reasonable interpretation — defendants are authorized to license the performances for use in visual media, such as movies and television commercials or broadcasts, and for domestic release by third parties in audio formats.
 

 Plaintiffs’ reliance upon
 
 Thomas v Gusto Records, Inc.
 
 (939 F2d 395 [6th Cir],
 
 cert denied
 
 502 US 984 [1991]) is misplaced. In
 
 Thomas,
 
 the United States Court of Appeals for the Sixth Circuit purportedly applied New York law and held that the
 
 *573
 
 parties’ agreements were ambiguous regarding the artists’ right to royalties from domestic licensing because the contracts were silent on the issue. The dispute in
 
 Thomas
 
 — whether the contract’s compensation clause entitled the plaintiffs to royalties from the issuance of domestic licenses — is not the same as the question posed in this case, which concerns the scope of owners’ rights to use their property. Furthermore,
 
 Thomas'
 
 suggestion that the failure of a contract to address certain categories of royalties allows a court to look beyond the four corners of the document to discern the parties’ true intent conflicts with our established precedent that silence does not equate to contractual ambiguity
 
 (see e.g. Reiss v Financial Performance Corp.,
 
 97 NY2d 195, 199 [2001];
 
 Trustees of Freeholders & Commonalty of Town of Southampton v Jessup,
 
 173 NY 84, 90 [1903] [“an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that' its meaning is doubtful”]).
 

 It follows that
 
 Caldwell v ABKCO Music & Records
 
 (269 AD2d 206 [2000]), which cites
 
 Thomas
 
 for the proposition that “[rjights not specifically granted by an artist in an agreement are reserved to the artist and the owner of such property, absent the clearest language, is not free to do with it whatever the owner wishes” (269 AD2d at 207), is not to be followed. Nor does
 
 Warner Bros. Pictures v Columbia Broadcasting Sys.
 
 (216 F2d 945) lead us to a different conclusion since the agreement in that case did not purport to confer full ownership rights — it was restricted to only certain aspects of the “Maltese Falcon” story.
 

 We realize that our conclusion here effectively prevents plaintiffs from sharing in the profits that defendants have received from synchronization licensing. However sympathetic plaintiffs’ plight, we cannot resolve the case on that ground under the guise of contract construction. Our guiding principle must be to neutrally apply the rules of contract interpretation because only in this way can we ensure stability in the law and provide guidance to parties weighing the risks and advantages of entering a binding agreement.
 

 Defendants acknowledge that the royalty schedule for domestic sales encompasses the sale of records, compact discs and other audio reproductions by entities holding domestic third-party distribution licenses from Philles Records. In light of that concession, we remit this case to Supreme Court to recalculate plaintiffs’ damages for royalties due on all such sales. Damages should be determined pursuant to the appli
 
 *574
 
 cable schedule incorporated in the agreement rather than based on industry standards.
 

 Defendants further claim that Greenfield is barred from sharing in those royalties because she executed a general release in connection with her divorce from Spector. We look to California law to analyze the scope of Greenfield’s release because that is the state where the release was executed and the divorce was finalized. In contrast to the “four corners” rule that New York has long applied
 
 (see e.g. Kass v Kass,
 
 91 NY2d 554, 566 [1998];
 
 Benedict v Cowden,
 
 49 NY 396 [1872]), California courts preliminarily consider all credible evidence of the parties’ intent in addition to the language of the contract— “[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible”
 
 (Pacific Gas & Elec. Co. v G.W. Thomas Dray age & Rigging Co.,
 
 69 Cal 2d 33, 37, 442 P2d 641, 644 [1968]).
 

 During proceedings in New York, Supreme Court determined that the extrinsic evidence supported Greenfield’s allegation that her right to compensation under the 1963 recording contract was not an intended subject of the release. That finding of fact, affirmed by the Appellate Division, is supported by the record. We find no reason to reverse the Appellate Division’s interpretation of California law
 
 (see e.g. Rudman v Cowles Communications,
 
 30 NY2d 1, 10 [1972]). Plaintiff Greenfield is therefore entitled to her share of any damages assessed against defendants.
 

 We have reviewed the parties’ remaining contentions; they are either academic or meritless.
 

 Accordingly, the order of the Appellate Division should be modified, without costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.
 

 Judges Levine, Ciparick, Wesley and Rosenblatt concur; Chief Judge Kaye and Judge Smith taking no part.
 

 Order modified, etc.
 

 [1]
 

 . Defendants acknowledge that the agreement did not restrict the ability of the Ronettes to earn income from concert performances and appearances on television or in movies, or to sell the reproduction rights to those performances.
 

 [2]
 

 . Whether defendants were allowed to use the Ronettes’ performances on compilation albums and the amount of compensation that Supreme Court awarded for that use have not been raised on appeal.
 

 [3]
 

 = “Transcriptions” were large discs used for reproducing musical performances for radio broadcasts.
 

 [4]
 

 . The dynamics of recording contracts were altered with the extension of federal statutory copyright protections to sound recordings in 1971. All the master recordings involved in this dispute predate that copyright statute.
 

 [5]
 

 .
 
 See also Batiste v Island Records Inc.,
 
 179 F3d 217, 223 (5th Cir 1999) (grant of unconditional rights to a musical composition included the licensing of a record containing a digital sample of the song),
 
 cert denied
 
 528 US 1076 (2000);
 
 Maljack Prods., Inc. v GoodTimes Home Video Corp.,
 
 81 F3d 881, 885 (9th Cir 1996) (unconditional grant of motion picture music rights included right to synchronize music in videocassette format);
 
 Ingram v Bowers,
 
 57 F2d 65, 65 (2d Cir 1932) (artist failed to reserve any property interest in recordings of his musical performances);
 
 Chambers v Time Warner,
 
 Inc., 123 F Supp 2d 198, 200-201 (SD NY 2000) (agreements permitted the conversion of master recordings to digital format),
 
 vacated on other grounds
 
 282 F3d 147 (2d Cir 2002).