■ STOCKLAND MARTEL, INC., et al., Respondents, v DONALD J. PLINER OF FLORIDA, INC., Appellant. [821 NYS2d 555]—

Judgment, Supreme Court, New York County (Walter B. Tolub, J.), entered December 2, 2004, against defendant in the principal sum of $65,862.12, bringing up for review an order, same court and Justice, entered November 23, 2004, which denied defendant's motion for summary judgment dismissing the complaint and granted plaintiffs' cross motion for summary judgment, unanimously reversed, on the law, with costs and disbursements, the judgment vacated, plaintiffs' cross motion denied, and the matter remanded for further proceedings. Appeal from the aforesaid order unanimously dismissed, without costs, as subsumed in the appeal from the ensuing judgment.

Plaintiff Nicola Majocchi is a professional photographer whose agent is plaintiff Stockland Martel. Defendant is a manufacturer, distributor and retailer of high fashion shoes and leather accessories. As part of its marketing program, defendant creates and uses artistic photo advertising campaigns that are published in magazines and other print media nationwide.

On October 20, 2000, Majocchi, through Stockland, submitted a production estimate to defendant for a photo shoot scheduled for the week of October 30, 2000. The estimate, describing the work and setting forth the photographer's fees and production expenses, provided for a 50% advance payment by defendant on the total, as well as submission of a purchase order upon approval of the job. The upper right-hand corner of the first page of the production estimate contained a stamp that read, "Confirmation of Job," followed by a signature line, which Stacy Sawyer, defendant's director of marketing, signed on October 20, 2000. Sawyer then faxed the estimate to Stockland. That same day, Stockland forwarded an invoice to Sawyer for the

required 50% advance. On October 24, Sawyer sent a purchase order to Stockland, confirming defendant's use of Majocchi for the shoot. Defendant paid the advance, and Majocchi performed the shoot and was paid the balance.

In January 2001, Stan Williams, the creative director on the October 2000 shoot, contacted Stockland with respect to Majocchi's availability for a Pliner photo shoot scheduled for April 2001. Thereafter, on February 14, 2001, Majocchi, Sawyer and a Stockland representative met for lunch to discuss the project. On March 2, Majocchi met with Sawyer and Williams and conveyed his concept for the shoot, and on March 9 he spoke directly to Donald Pliner, defendant's principal, during a conference call. On March 11, Majocchi, through Stockland, submitted a production estimate to defendant for the April 2001 shoot. Three days later, Majocchi submitted a revised estimate, reducing his fee from $75,000 to $60,000 and the total estimate from $129,709 to $111,915. The March 14, 2001 production estimate was similar to the October 2000 estimate, describing the work, setting forth the photographer's fees and production expenses, and requiring a 50% advance and purchase order on approval of the job. Unlike the 2000 estimate, however, it did not contain a confirmation of job stamp with a signature line in the upper right-hand corner of the first page. Both the 2000 and 2001 production estimate obligated defendant to pay Majocchi a 100% cancellation fee plus expenses if it cancelled the job within five days of the shoot. Majocchi alleges that he and Sawyer verbally agreed to the estimate on March 14. On March 15, defendant faxed the estimate back to Stockland with the notation "OK per Len" next to the total estimate, with Sawyer's initials appearing below the notation.

On March 29, 2001, Majocchi met with Ralph Gibley, a public relations consultant for defendant, to discuss the shoot. Unbeknownst to Majocchi, Gibley had interviewed three other photographers about the shoot and ultimately recommended one of the others. On April 9, Stockland informed Majocchi that the job "was off," and on April 20 it invoiced defendant for a $60,000 cancellation fee, plus expenses of $5,862.12, which defendant refused to pay, leading to the commencement of this action for breach of contract. Plaintiffs allege that the March 14, 2001 production estimate, which, they claim, defendant accepted in writing on March 15, was an enforceable contract.

After the completion of discovery, defendant moved for summary judgment dismissing the complaint, arguing that the March 2001 production estimate was merely a bid proposal, not a contract. It asserted that the issuance of a purchase order and

tender of an advance check were preconditions to the formation of a contract, and these preconditions were never met, noting the absence of a signed confirmation stamp. Defendant supported its motion with an affidavit by Gibley stating that Majocchi's production estimate was one of several it had received and rejected on Gibley's advice. As for the handwritten "OK per Len" notation on Majocchi's estimate, that only signified approval of the amount of the production estimate from a budget perspective by Len Pesko, defendant's president and chief operating officer. Pesko also submitted an affidavit confirming that the "OK per Len" notation meant only that the photographer's projected costs were within budget. Plaintiffs opposed the motion and cross-moved for summary judgment, submitting supporting affidavits by Majocchi and Bill Stockland, the president of the corporate plaintiff. Majocchi stated that defendant asked him to contact Gibley, that he agreed to do so as an accommodation, and that Gibley never indicated he was interviewing him or considering other photographers for the shoot. Stockland indicated that while Gibley's affidavit claimed all of the four or five photographers interviewed for the April 2001 shoot had submitted production cost estimates, two of the estimates furnished during discovery were fabrications.* Defendant never furnished the production estimate of Michael Jackson, the photographer chosen for the April 2001 shoot, claiming that the file relating to Williams "no longer exists." In a reply affidavit, Pesko, responding to Majocchi's claim that Stacy Sawyer verbally confirmed the contract, stated that Sawyer was "only authorized to confirm a job after first obtaining approval from Donald Pliner, the CEO of the company."

In denying defendant's motion and granting the cross motion, the court concluded that the March 14, 2001 production estimate constituted an offer that was accepted by defendant when it was signed by Pesko and Sawyer and faxed to Stockland the next day. As to the similarity between the procedure followed in April 2001 and October 2000, the court found that the "mere fact that a confirmation stamp did not appear on the 2001 estimate is not enough to raise a material issue of fact." The court also found that Sawyer did not need approval before she could authorize the engagement of Majocchi. Judgment for plaintiffs was thereafter entered. Pliner appeals from both the judgment and the order. We reverse and vacate the judgment.

The motion court erred in finding that the March 14, 2001 production estimate with the notation "OK per Len" and

---

* It appears that altogether, defendant furnished only three estimates during discovery.

Sawyer's initials was an enforceable contract as a matter of law. Mutual assent to all of the material terms proposed is essential to the formation of a contract (*see Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 589-590 [1999]). Unlike the October 2000 production estimate, the March 2001 estimate does not contain a confirmation stamp with a signature line. Although the latter does contain a notation indicating approval by defendant's president, this appears on page two, next to the total estimate, and was explained by Pesko only to indicate that the amount was within budget. The initials of Stacy Sawyer, apparently no longer employed by defendant, may signify no more and, in any event, her authority to approve a job is challenged. Thus, defendant's assent to the agreement embodied in the March 14, 2001 production estimate is not clear and unambiguous from the document itself, and resort to extrinsic evidence is in order (*see Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). Significantly, in contrast to the October 2000 shoot, defendant did not follow up its alleged approval of Majocchi's March 2001 production estimate with the submission of a purchase order or payment of a 50% advance. Although the parties disagree as to whether the contract was conditioned upon the submission of a purchase order and payment of a 50% advance, defendant's failure to comply with these conditions is relevant as to whether it had bound itself to the March 14, 2001 production estimate. The conflicting affidavits submitted by the parties only serve to highlight the existence of a triable issue of fact as to whether defendant assented to its terms. Thus, neither side is entitled to summary judgment, and plaintiffs' cross motion for such relief should have been denied. Concur—Mazzarelli, J.P., Saxe, Sullivan, Nardelli and Williams, JJ.