(April 26, 2016)

■ GARTHON BUSINESS INC. et al., Appellants, v KIRILL ACE STEIN et al., Respondents. [31 NYS3d 19]—

Orders, Supreme Court, New York County (Shirley Werner Kornreich, J.), entered April 1, 2015, which granted the separate motions of defendants Kirill Ace Stein and Aurdeley Enterprises Limited to compel arbitration and stay discovery, and dismissed the action subject to certain conditions, reversed, on the law, with costs, the motions denied, and the complaint reinstated. Order, same court and Justice, entered April 1, 2015, which denied plaintiffs' motion for limited discovery on the issues of, inter alia, personal jurisdiction and alter ego, modified, on the law, to permit discovery on those issues, and otherwise affirmed, with costs.

Plaintiffs are entities controlled by Patokh Chodiev, a Kazakh businessman. Defendant Kirill Ace Stein, individually and through an entity controlled by him called Aurdeley Enterprises Limited, provided financial consulting advice to plaintiffs and other companies affiliated with Chodiev and his family. Initially, the terms of the arrangement between the Chodiev entities and Stein/Aurdeley were set forth in two separate agreements, both of which became effective on January 1, 2000. The first agreement, between an entity called Quennington Investments Limited on the one hand, and Stein on the other (Quennington agreement), was for an indefinite term, although each party had the right to terminate on notice. The Quennington agreement also provided that it was to be governed by the law of the United States, and that "the Courts of the United States of America shall have exclusive jurisdiction to settle any claim, dispute, or matter of difference, which may arise out of or in connection with this Agreement . . . or the legal relationship established by this Agreement." The second agreement was between Chodiev and Aurdeley (First Aurdeley agreement). It was essentially identical to the Quennington agreement, except that it was to be governed by the law of England and Wales, and the courts of England were to have exclusive jurisdiction over any disputes arising out of it.

By agreement dated September 30, 2009, Aurdeley and Chodiev entered into a second consulting agreement (Second Aurdeley agreement), which was intended to have an effective

date of July 1, 2009. The preamble to that agreement referenced both the Quennington agreement and the First Aurdeley agreement, and recited that the new agreement arose out of Chodiev's desire to reduce the fee Stein was to receive for the consulting services that were the subject of the Quennington agreement and the First Aurdeley agreement. The Second Aurdeley agreement expressly terminated the First Aurdeley agreement, and stated that neither party was to "have any further liability to [the] other of whatsoever nature pursuant to or in respect of [the First Aurdeley agreement] and (for the avoidance of doubt) [Chodiev] shall have no further liability to make any payment of whatsoever nature to [Aurdeley] pursuant to or in respect of [the First Aurdeley agreement]." It also had a standard merger clause, providing that it "supersedes all prior arrangements, agreements or understandings (both oral and written) relating to the subject matter of this Agreement." Finally, the Second Aurdeley agreement stated that "[a]ny dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules."

A separate agreement between Stein and Quennington, also entered into on September 30, 2009 (Quennington termination agreement), expressly terminated the Quennington agreement, using the same language employed by the Second Aurdeley agreement to terminate the First Aurdeley agreement. The Quennington termination agreement also provided for arbitration of any disputes, utilizing the same language as in the Second Aurdeley agreement.[1]

Plaintiffs commenced this action in or about December 2014. The plaintiffs were alleged to be entities controlled by Chodiev. Plaintiff Crestguard Limited was alleged to be a wholly-owned subsidiary of plaintiff Garthon Business Inc., and it allegedly owned 100% of nonparty SBS Steel, a Kazakh company. According to the complaint, beginning in the spring of 2009, Stein, acting under the various consulting agreements discussed above, advised Chodiev (through Garthon and Crestguard) in connection with SBS Steel's decision to retain nonparty Hares

---

**1.** Also on September 30, 2009, Aurdeley entered into a consulting services agreement, effective from July 1, 2009 through March 1, 2010, with Mounissa Chodiev, Patokh Chodiev's daughter, in which Aurdeley agreed to provide the same financial advisory services for a conditional one-time fee of $386,664. This agreement contained the same limitation of liability provision and arbitration clause as the Second Aurdeley agreement.

Engineering, a company owned by an individual named Youssef Hares, to construct a steel plant in Kazakhstan. Plaintiffs claim that Stein recommended that, in order to ensure that Hares Engineering could complete the steel plant, they make personal, unsecured loans to Youssef Hares. Chodiev accepted this advice, and by an agreement dated June 7, 2009, Crestguard extended an interest-free loan to Youssef Hares in the amount of $7 million, repayable in December 2009. Two similar loans were extended by Crestguard to Hares, one pursuant to an agreement dated December 30, 2009 in the amount of $3 million, and another pursuant to an agreement dated August 10, 2010 in the amount of $6 million. Youssef Hares never repaid the loans, and plaintiff asserted causes of action against defendants for, among other things, breach of fiduciary duty and breach of the "Consulting Services Agreements." "Consulting Services Agreements" was a defined term in the complaint, relating back to all of the agreements between Chodiev/ Quennington and Stein/Aurdeley, including those that were ultimately terminated. The complaint specifically alleged that Stein and Aurdeley are alter egos of each other, that Aurdeley is a sham entity, and that Stein is a New York domiciliary. Defendants moved for a stay of the action and an order compelling arbitration of all the claims in London, arguing that all of the claims were governed by the Second Aurdeley agreement and the Quennington termination agreement, which provided for arbitration as an exclusive dispute resolution mechanism. Alternatively, they argued that only an arbitration tribunal could determine whether the forum selection clause in the Quennington agreement, which provided for litigation in United States courts, controlled. In opposition, plaintiffs argued that the broad forum selection clause in the Quennington agreement continued to apply to the claims accruing between January 1 and June 30, 2009, notwithstanding the subsequent agreements. Plaintiffs moved separately to compel discovery in the action, claiming that the parties' intent concerning forum selection, as well as Stein's relationship to Aurdeley and his amenability to jurisdiction in New York courts, could not necessarily be ascertained without it. The court granted defendants' motion to the extent of dismissing the action "on [the] condition that defendants not object to arbitration in the London court . . . and agree to the arbitration action relating back to the filing of this case on December 3, 2014." The court also denied plaintiffs' motion to compel discovery.

On appeal, plaintiffs argue that the claims alleged in the complaint relate to consulting services provided by Stein under the Quennington agreement. Since that agreement unquestion-

ably provided that disputes arising under it are to be litigated in the United States courts, they maintain that the court erred in dismissing the complaint. Plaintiffs acknowledge the arbitration clauses in the Second Aurdeley agreement and in the Quennington termination agreement, but deny that they nullified the forum selection clause in the Quennington agreement, since they did not explicitly disavow it. They further posit that, to the extent their claims relate to loans made to Hares, on Stein's advice, after July 1, 2009, the effective date of the Second Aurdeley agreement, they are still entitled to litigate those claims in court, since they are inextricably intertwined with claims that arose earlier. Defendants counter that, taken together, the release of liability and merger clause in the Second Aurdeley agreement, the termination of the Quennington agreement and the First Aurdeley agreement, and the arbitration provisions in the Second Aurdeley agreement and the Quennington termination agreement, all dictate that the sole dispute resolution mechanism available to plaintiffs is arbitration.

"Forum selection clauses are enforced because they provide certainty and predictability in the resolution of disputes, particularly those involving international business agreements" (*Brooke Group v JCH Syndicate 488*, 87 NY2d 530, 534 [1996]). The mere termination of a contract containing such a clause does not mean that the clause is not still effective (*see Getty Props. Corp. v Getty Petroleum Mktg. Inc.*, 106 AD3d 429, 430 [1st Dept 2013]). Rather, a "clear manifestation of [the parties'] intent" to terminate the clause is necessary if a party is to disregard such a clause upon termination of the contract in which it is found (*Matter of Primex Intl. Corp. v Wal-Mart Stores*, 89 NY2d 594, 602 [1997]). Defendants find such clear manifestation in the arbitration clauses themselves, which they argue reflect a conscious decision by the parties to arbitrate any disputes arising out of the agreements. However, the best evidence of what the parties intended is the plain meaning of the contract (*see Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). Here, the arbitration clauses at issue each confine arbitration to "[a]ny dispute arising out of or in connection with *this* Agreement, including any question regarding its existence, validity or termination" (emphasis added). At best, this language indicates that the parties intended only to arbitrate disputes that arose after July 1, 2009, the effective date of those agreements. It does not indicate a clear manifestation that the forum selection clause in the Quennington agreement had been abandoned.

Indeed, the arbitration clauses are of much narrower scope

than the forum selection provision in the Quennington agreement. In addition to disputes related to the Quennington agreement itself, the forum selection clause in the Quennington agreement applied to the "legal relationship established by" the agreement. That relationship survived the Quennington agreement. Since the complaint asserts that Stein breached the fiduciary duty born out of that relationship, the forum selection clause should apply to the complaint.

As for the effect of the merger clauses in the Second Aurdeley agreement and the Quennington termination agreement, *Primex Intl. Corp.* (89 NY2d 594), is instructive. There, the plaintiff and the defendant entered into three successive, identical agreements. The first two contained an arbitration clause, but the third did not (*id.* at 596-597). The third agreement also contained a merger clause that was substantially similar to the one contained in the Second Aurdeley agreement and the Quennington termination agreement (*id.* at 597).[2] During the term of the third agreement, a dispute arose, and the defendant commenced an action for, inter alia, breach of all three agreements (*id.* at 597). The plaintiff sought to compel arbitration, asserting that the merger clause in the third agreement did not negate the arbitration clause in the first two agreements (*id.* at 598). The Court of Appeals agreed, finding that "the language of the merger clause was insufficient to establish any intent of the parties to revoke retroactively their contractual obligations to submit disputes arising thereunder to arbitration" (*id.* at 599). The Court explained that the purpose of a merger clause is to give full effect to the parol evidence rule, which bars extrinsic evidence tending to vary the terms of the agreement in which the merger clause is included (*id.* at 599-600). Thus, an antecedent agreement that does not modify the terms of the agreement with the merger clause continues to stand on its own (*id.*).

Here, the forum selection clause in the Quennington agreement did not alter the arbitration clause in the Second Aurdeley agreement or the Quennington termination agreement. Accordingly, the merger clause in the latter agreements does not serve to negate the forum selection clause in the Quennington agreement or plaintiffs' right to pursue their claims in court. Further, to the extent that the Second Aurdeley agree-

---

**2.** The merger clause in *Primex* read as follows: "This Agreement may not be amended, changed, modified, or altered except by a writing signed by both parties. All prior discussions, agreements, understandings or arrangements, whether oral or written, are merged herein and this document represents the entire understanding between the parties" (89 NY2d at 596-597).

ment and the Quennington termination agreement contained language releasing the parties from liability arising out of their predecessor agreements, that language only served to alter the substantive rights of the parties; absent express language to the contrary, it cannot be interpreted as having altered the forum selection provisions contained in the Quennington agreement (*see Matter of Schlaifer v Sedlow*, 51 NY2d 181, 185 [1980]).

Plaintiffs argue that, notwithstanding the clear choice of the parties to arbitrate disputes arising out of the Second Aurdeley agreement and the Quennington termination agreement, all of the allegations in the complaint should be litigated in court, notwithstanding that two of the loans extended to Hares were made after those agreements were executed. Although this Court does not appear to have directly addressed the issue, the other Departments have held that, where some of a group of claims are covered by an arbitration agreement, it is appropriate to litigate the entire group in court if all of the claims were already asserted in court and the claims not subject to arbitration would be "inextricably bound together" with the claims that are subject to arbitration (*Steigerwald v Dean Witter Reynolds*, 84 AD2d 905, 906 [4th Dept 1981], *affd* 56 NY2d 621 [1982] [even if the plaintiff's dispute with current employer was governed by arbitration agreement with former employer, it was not "suitable . . . that there be two forums to resolve what is in reality one lawsuit"]; *Brennan v A. G. Becker, Inc.*, 127 AD2d 951 [3d Dept 1987] [where the plaintiff held business and personal investment accounts with the defendant and the only agreement governing the personal account contained an arbitration clause, a dispute involving all of the accounts would be litigated in court, where an action had already been commenced]; *see also Young v Jaffe*, 282 AD2d 450 [2d Dept 2001]).

Here, one could argue that all of the claims in the complaint arose under the Quennington agreement, since, notwithstanding that two of the loan agreements with Hares were executed after the termination of that agreement, plaintiffs allege that Stein first advised them to loan money to Hares personally in spring 2009, when that agreement was unquestionably in effect. In any case, even if some of the claims could be said to arise out of the Quennington agreement, and others out of the Second Aurdeley agreement, they are cut from the same cloth, and are, unquestionably, inextricably bound together and therefore should be litigated in court.

We disagree with the dissent's position that the London Court of International Arbitration (LCIA) should decide the issue of arbitrability. As the dissent acknowledges, the general rule is that the question of arbitrability is an issue for the courts (*see Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 45 [1997]). The case on which the dissent relies, *Zachariou v Manios* (68 AD3d 539 [1st Dept 2009]), recognizes that it is appropriate for arbitrators to decide the issue of arbitrability where the agreement to arbitrate incorporated the arbitral body's rules reserving arbitrability to itself.[3] However, the *Zachariou* court declined to hold that the arbitrators should decide the issue in that case, since the arbitration agreement there was a narrow one. Because it was narrow, this Court held, "the reference to the [arbitration] rules [did] not constitute clear and unmistakable evidence that [the parties] intended to have an arbitrator decide arbitrability" (68 AD3d at 539).

Here, as discussed above, the Quennington agreement designated the courts as the sole forum for dispute resolution, and the subsequent agreements, notwithstanding their arbitration clauses, did not nullify that designation. Since that is the case, we cannot state with any degree of certainty that the parties clearly and unmistakably intended for the chosen arbitral body to decide the particular issue presented to us. To hold otherwise would be to completely ignore the existence of the forum selection clause in the Quennington agreement, which the parties never abrogated. The Court of Appeals recently reaffirmed that the issue of arbitrability is for the arbitrators only where the parties clearly and unmistakably agreed that the arbitrators should decide that issue (*Matter of Monarch Consulting, Inc. v National Union Fire Ins. Co. of Pittsburgh, PA*, 26 NY3d 659 [2016]). However, *Monarch Consulting* has no application here since the agreements containing the arbitration clauses in that case did not, like here, directly clash with an enforceable forum selection clause in a separate agreement relevant to the parties' dispute.

Moreover, the arbitration clauses, in relation to the forum selection clause contained in the Quennington agreement, are far narrower, since, as mentioned earlier, they apply to the agreements themselves, whereas the forum selection clause applies to disputes arising not only out of the Quennington agreement, but also "the legal relationship established by" the agreement. Of course, if plaintiffs had presented claims that unquestionably and wholly originated *after* the termination of

---

**3.** We assume that the dissent takes judicial notice of the rules of the LCIA, since they are not found in the record.

the Quennington agreement, the issue of arbitrability would have been for the arbitrators, who most likely would have found that the claims were subject to arbitration. That, however, is not the case. Finally, to the extent factual issues exist concerning, inter alia, whether Stein and/or Aurdeley are alter egos of each other, such that Aurdeley is a proper defendant here notwithstanding its not being a party to the Quennington/Stein agreements, and whether Stein and Aurdeley are subject to personal jurisdiction in New York, the parties are entitled to conduct discovery. Concur—Mazzarelli, J.P., Sweeny and Richter, JJ.

Manzanet-Daniels and Gische, JJ., dissent in a memorandum by Gische, J., as follows: Because I believe that under the parties' termination agreement, the gateway issue of arbitrability belongs to the arbitrators and not the court, I respectfully dissent and would affirm the motion court's decision to compel arbitration at this juncture. I neither agree nor disagree with the majority's conclusion that the later agreements at issue did not negate the effectiveness of the forum selection clause in the earlier Quennington agreement. I only conclude that, under established precedent in our Court, the determination of that issue belongs to the arbitrators (*Zachariou v Manios*, 68 AD3d 539 [1st Dept 2009]; *Life Receivables Trust v Goshawk Syndicate 102 at Lloyd's*, 66 AD3d 495 [1st Dept 2009], *affd* 14 NY3d 850 [2010], *cert denied* 562 US 962 [2010]).

Plaintiffs commenced this action alleging breach of contract, breach of fiduciary duty, constructive fraud and negligent misrepresentation in connection with certain consulting agreements in which defendants Kirill Ace Stein and/or Aurdeley Enterprises Limited agreed to provide financial advice to companies owned or controlled by the Chodiev family. Patokh Chodiev is the beneficial owner of plaintiffs and patriarch of the Chodiev family. Stein is an associate of Aurdeley and apparently its sole employee.

Plaintiffs' claims relate to three loans it made, beginning in June 2009 and totaling $16 million, on defendants' advice and urging, in connection with a steel plant located in Kazakhstan. Plaintiffs allege that defendants advised them to make personal loans to an individual who is the principal of a company to which the plaintiffs owed money. According to plaintiffs, had they paid that money directly to the company, instead of structuring the transaction as a loan to the company's owner, they would have partially satisfied their debt to the company. Ultimately, the individual defaulted on the loans, plaintiffs were unable to recover the money that they

had lent to him because the loans were unsecured, and the company to whom they were indebted would not reduce plaintiffs' debt to the company by the amount of the personal loans.

Various interrelated agreements are involved. The first agreement (Quennington agreement), effective January 1, 2009, is between Stein and Quennington Investments Limited, another company owned by Patokh Chodiev and affiliated with plaintiffs. The Quennington agreement, which was to have continued indefinitely unless terminated by one of the parties upon three months' notice, contains a forum selection clause stating that "[t]he courts in the United States of America shall have exclusive jurisdiction to settle any claim, dispute, or matter of difference, which may arise out of or in connection with this Agreement (including without limitation, claims for set-off or counterclaim) or the legal relationship established by this Agreement."

A second agreement for consulting services, effective January 1, 2009, between Patokh Chodiev, individually, and Aurdeley (agreement 2), also contains a forum selection clause, but it specifies that "[t]he courts of the [sic] England shall have exclusive jurisdiction to settle any claim, dispute, or matter of difference, which may arise out of or in connection with this Agreement (including without limitation, claims for set-off or counterclaim) or the legal relationship established by this Agreement." The Quennington agreement and agreement 2 each provide for payment of compensation for consulting services, but in the Quennington agreement, payment is directly to Stein, whereas in agreement 2, payment is to Aurdeley.

On September 30, 2009, Mounissa Chodieva (Patokh's daughter) and Aurdeley entered into another agreement (agreement 3) effective July 1, 2009. Agreement 3 specifies that it continues in effect until March 1, 2010 or until the "Other Agreement" made between Patokh Chodiev and Aurdeley "shall terminate." Agreement 3 contains multiple references to the Quennington agreement and amends the terms of Stein's and Aurdeley's compensation under their respective agreements. Agreement 3's forum selection clause provides that "[a]ny dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference."

A fourth agreement, also dated September 30, 2009, between

Patokh Chodiev and Aurdeley, refers to the Quennington agreement and agreements 2 and 3. The fourth agreement, which provides for a reduction in the total annual amount of compensation to be paid for Stein/Aurdeley's financial services, includes the following merger clause: "[t]his Agreement contains the entire agreement and understanding of the parties and supersedes all prior arrangements, agreements or understandings (both oral and written) relating to the subject matter of this Agreement." The fourth agreement also provides that the Quennington agreement "shall be terminated by mutual consent of the parties to it" and that "neither the Client nor the Consultant shall have any further liability to [the] other of whatsoever nature pursuant to or in respect of [the Quennington agreement]." With respect to the governing law and jurisdiction, the fourth agreement states that "[a]ny dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration [LCIA] Rules, which Rules are deemed to be incorporated by reference into this Clause."

Yet another agreement, also dated September 30, 2009, but between Quennington and Stein, effective July 1, 2009 (termination agreement), purports to terminate the Quennington agreement, providing that "neither of them shall have any further liability to [the] other of whatsoever nature pursuant to or in respect of the [Quennington] Agreement and (for the avoidance of doubt) Quennington Investments Limited shall have no further liability to make any payments of whatsoever nature to . . . Stein pursuant to or in respect of the Agreement." The termination agreement contains an arbitration clause identical to the fourth agreement.

Former article 23.1 of the LCIA rules, in effect at the time the termination agreement, agreement 3, and the fourth agreement were executed, provide that the "Arbitral Tribunal shall have the power to rule on its own jurisdiction, including any objection to the initial or continuing existence, validity or effectiveness of the Arbitration Agreement" (LCIA Arbitration and ADR Worldwide, LCIA Arbitration Rules [eff Jan. 1, 1998], http://www.lcia.org/Dispute_Resolution_Services/ LCIA_Arbitration_Rules.aspx#article 23 [accessed Mar. 10, 2016]).

The core dispute on this appeal concerns forum selection. Defendants contend that the arbitration clause in the termination agreement supersedes all other forum selection clauses in

the earlier agreements. Plaintiffs argue that the forum for this dispute, which arises out of the Quennington agreement, is the courts of the United States. Before we reach the parties' forum dispute, however, the gateway issue is who gets to decide the issue about the proper forum, or arbitrability.

Whether a dispute is arbitrable is generally an issue for the court to decide (*Hawkeye Funding, Ltd. Partnership v Duke / Fluor Daniel*, 307 AD2d 828, 828 [1st Dept 2003], *lv denied* 1 NY3d 538 [2003]). The general rule, however, does not apply where the parties have clearly and unmistakably provided that this jurisdictional issue is to be decided by an arbitrator (*Matter of Monarch Consulting, Inc. v National Union Fire Ins. Co. of Pittsburgh, PA*, 26 NY3d 659 [2016]; *Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 45-46 [1997]). The recent Court of Appeals case in *Monarch* directly supports application of the exception to the general rule when a valid arbitration clause reserves to itself gateway issues of arbitrability. In *Monarch*, the Court of Appeals held that the issue of whether the parties' underlying dispute, regarding the validity of workers' compensation payment contracts and their arbitration clauses should be decided by the courts or in arbitration belonged, in the first instance, to the arbitrators (26 NY3d at 675). In so holding, the Court recognized that the parties had agreed that the arbitrators had exclusive jurisdiction over the entire matter in dispute, including any question as to arbitrability (*id.* at 674-675). Relatedly, this Court has previously held that where there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the American Arbitration Association rules providing that the arbitration panel shall have the power to rule on its own jurisdiction, the gateway issue of arbitrability belongs to the arbitrators (*Zachariou v Manios*, 68 AD3d 539, 539 [1st Dept 2009]; *see Life Receivables Trust v Goshawk Syndicate 102 at Lloyd's*, 66 AD3d 495, 495-496 [1st Dept 2009], *affd* 14 NY3d 850 [2010], *cert denied* 562 US 962 [2010]). At bar, the arbitration clause in the termination agreement includes broad language referring to "any dispute arising out of" the termination agreement (*State of New York v Philip Morris Inc.*, 30 AD3d 26, 31 [1st Dept 2006], *affd* 8 NY3d 574 [2007]). In addition, it incorporates the rules of the LCIA, which like the rules of the AAA, provide that the arbitrators shall rule on the issue of their own jurisdiction. This contractual language and the reference to LCIA rules is sufficiently broad to have the arbitrator decide in the first instance whether the parties' dispute falls within its jurisdiction. This Court need not go any further at this time. Only if the arbitrator decides that LCIA has no jurisdiction over the

merits of the parties' dispute will this Court be in a position to make substantive rulings in this case.

My disagreement with the majority is only that it goes too far. In deciding that the provisions of the later agreements, which contain broad arbitration clauses, do not apply to disputes arising out of the Quennington agreement, it necessarily interprets the meaning of the provisions in those later agreements, which supersede, terminate and release liability under the Quennington agreement, as being prospective only. In doing so, it decides the issue of jurisdiction under the arbitration provisions, even though the arbitration clauses reserved to the arbitrator the right to determine the issue of arbitrability.

I would also affirm the motion court's denial of discovery, but instead of dismissing the complaint, I would have stayed the litigation pending arbitration.