# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 3, 2023

Lyle W. Cayce
Clerk

No. 22-20274

In the Matter of Speedcast International Limited,

*Debtor,*

Inmarsat Global Limited; Inmarsat Solutions B.V.;
Inmarsat Maritime Ventures, Limited; Inmarsat
Incorporated; Inmarsat Solutions (US) Incorporated;
Inmarsat Solutions (Canada) Incorporated; Inmarsat
Solutions AS Norway,

*Appellants,*

*versus*

Speedcast International Limited,

*Appellee.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-8

Before Barksdale, Southwick, and Higginson, *Circuit Judges.*
Leslie H. Southwick, *Circuit Judge*:

This bankruptcy appeal is all about contract interpretation. Several contracts governed the business relationship among the parties. Their last contract terminated all of the creditors' claims against the debtor except for

No. 22-20274

narrowly defined "Permitted Claims." The creditors seek reversal of the district and bankruptcy court's conclusion that a particular claim was not a permitted one. We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

The facts are mostly undisputed. Inmarsat Global Limited and related entities (collectively, "Inmarsat") operate a satellite network providing communications services to remote locations, including ships at sea. Inmarsat sells the services at retail to end-users and at wholesale to distributors. Speedcast International Limited was a leading Inmarsat distributor, purchasing Inmarsat's services and providing them to its own customers. Speedcast is the debtor in the bankruptcy.

Several agreements governed the parties' relationship. Inmarsat sold satellite services to Speedcast under various Master Service Agreements ("MSAs"), which described the services Inmarsat would deliver and expressed the terms for their delivery — including price.

In 2016, Inmarsat launched "Fleet Xpress," or "FX," a maritime communications service. In connection with the launch, the parties entered into a Strategic Alliance Agreement ("SAA"). In the SAA, Inmarsat gave Speedcast a 30% discount off its usual pricing, and Speedcast promised a certain volume of business. Specifically, in the SAA's "Pricing Principles," Inmarsat agreed to "[a] discount of thirty percent (30%) on Tier 1 Pricing for all available FX[] service and price plans, applicable for all Speedcast FX[] customers." "In exchange for" the discount, Speedcast contracted to provide Inmarsat a minimum number of customers, called a "Minimum RGU[1]

---

[1] An "RGU" correlates to a customer vessel. It is a terminal "installed on a Commercial Maritime vessel, used as a primary communication link and subscribed for a single FX/GX service plan."

Commitment." Speedcast committed to meet the minimum number of customers in each of the five years starting in 2017, and to meet its cumulative commitment of 1800 new customers "across the entire five (5) year period."

An additional payment was provided for in the SAA: "If Speedcast d[id] not meet the Minimum RGU Commitment" in any given year, it was obligated to pay a "Shortfall Amount." The shortfall payment was calculated by a formula using the amount by which Speedcast fell short of its commitment to sign up new customers or switch them from other services to the FX services. The parties refer to this as the "'take-or-pay' obligations."

In December 2019, the parties executed an amendment to the SAA. The amendment provided Speedcast with an immediate credit on its overdue debt, extended payment terms for amounts past due under several MSAs, and revised Minimum RGU Commitments for FX services applicable from January 1, 2020, forward. Those Minimum RGU Commitments required Speedcast to make FX services the majority of its new installations, to move existing customers from other services to FX services, and to keep current FX customers on FX services. Speedcast received discounted pricing during 2020.

The 2019 Amendment stated: "Performance [shall] be reviewed at the end of each calendar year starting at the end of 2020 . . . . Inmarsat shall invoice Speedcast for any ship shortfall each year under the above clauses." Throughout 2020, Inmarsat billed Speedcast at the SAA's discounted prices for its FX services, and Speedcast consistently paid that discounted price.

On April 23, 2020, Speedcast filed for Chapter 11 bankruptcy. Inmarsat continued to provide satellite services to Speedcast. In June 2020, Speedcast determined it would not meet its Minimum RGU Commitment and that the Shortfall Amount would be large. The parties began negotiations and

discussed transferring "Speedcast customers to the Inmarsat platform and a full and final release of Speedcast from all take-or-pay obligations."

On November 13, 2020, the parties entered into a settlement consisting of two documents: an Asset Sale Agreement and a Deed of Termination and Release ("Termination Agreement"). Speedcast agreed to transfer its customer contracts and other assets to Inmarsat in exchange for Inmarsat's releasing all of its claims against Speedcast. The release was subject to a narrow exception which was labeled the "Permitted Claims." The parties terminated all but one of their prior contracts. The Asset Sale Agreement provided that Speedcast would sell, and Inmarsat would buy, "all of [Speedcast's] right, title, and interest in, to and under the Assets." The "Assets" included Speedcast's customer contracts.

Under the Termination Agreement, Speedcast agreed to pay for all services delivered by Inmarsat under the Existing Agreements through the Effective Date of January 1, 2021. The Termination Agreement provided that "each Existing Agreement is terminated in full" as of that date. Additionally, neither party "will have any further rights or obligations under any Existing Agreement." A Hong Kong MSA, not relevant here, was the only "Surviving Agreement" that would not be terminated. All other MSAs and the SAA were "Existing Agreements" that would be terminated as of January 1, 2021.

The Termination Agreement also contained a broad release of Inmarsat's claims: Inmarsat agreed to "absolutely, irrevocably and unconditionally forever release and discharge" Speedcast from "any Released Claims . . . arising out of or relating to" the Existing Agreements or Surviving Agreement, "whether arising prior to, on or after" the Effective Date. "Released Claims" were defined as "other than the Permitted Claims, any and all

claims, actions, [or] causes of action . . . existing at any time, whether asserted or unasserted at the Effective Date."

"Permitted Claims" were defined as:

any claims for payment by an Inmarsat Entity for services delivered by the relevant Inmarsat Entity to a Speedcast Entity after 23 April 2020 under, and otherwise on the terms of, any Existing Agreement or the Surviving Agreement, including any applicable interest, fees or costs relating to such payment claims which are, or become, due and payable under the terms of the relevant Existing Agreement or the Surviving Agreement (as applicable).

On November 13, 2020, Speedcast filed a motion with the bankruptcy court to approve the settlement under 11 U.S.C. § 363 and § 365. The motion stated Speedcast's prospects for future profitability were "contingent upon adding new customers and meeting certain minimum levels of customer renewals to avoid substantial penalties under existing contractual arrangements between [Speedcast] and Inmarsat." The motion stated that Speedcast "d[id] not anticipate such targets being met." A declaration supporting the motion stated that, "[a]fter factoring in estimated penalties, the aggregate impact for the forecast period of fiscal year 2020 through fiscal year 2023 is a loss of $11.6 million USD." The declaration reiterated that Speedcast did not anticipate meeting its targets and "estimated such penalties at approximately $25 million USD across FY20 — 23." On December 11, 2020, the court approved the settlement, and it took effect on January 1, 2021.

Speedcast failed to meet the earlier contracted-for target for deployment of FX services during the period from April 23, 2020, through January 1, 2021. Inmarsat issued an invoice reflecting that Speedcast fell short of the minimum commitment and estimated the Shortfall Amount under the SAA at $2,161,890.

No. 22-20274

On April 9, 2021, Inmarsat filed an administrative expense claim for the Shortfall Amount under the SAA based on Speedcast's failure to meet its 2020 Minimum RGU targets. Speedcast objected on the basis that Speedcast had already paid Inmarsat to release its claim to the Shortfall Amount. Inmarsat also sought $2.9 million for satellite services that Inmarsat delivered to Speedcast between April 23, 2020, and March 2021 under the Hong Kong MSA. Speedcast did not dispute that claim. The court approved it, and Speedcast paid it.

On December 21, 2021, the bankruptcy court denied Inmarsat's claim for the Shortfall Amount. The court interpreted the Termination Agreement as having released all claims except for "Permitted Claims," and the Shortfall Amount was not a Permitted Claim. Thus, Inmarsat had released its claim for those amounts. Specifically, the court found Permitted Claims are limited to claims for payment "for services delivered . . . under, and otherwise on the terms of" a prior agreement. The bankruptcy court explained that "Inmarsat delivered its services under the [MSAs], not the [SAA]," and the "Shortfall Amount arises under the terms of the [SAA]." Because "no services were delivered under the [SAA]," the court explained, Inmarsat's claim could not qualify as a Permitted Claim and was, therefore, released and disallowed.

The district court affirmed, holding Inmarsat had released its claim for the Shortfall Amount. Inmarsat timely appealed.

## DISCUSSION

"We review the bankruptcy court's rulings and decisions under the same standards employed by the district court." *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003). As such, we review legal conclusions *de novo* and findings of fact for clear error. *Id.* This court reviews a "district court's interpretation of a contract *de novo*." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th

Cir. 2004). "Whether there is a 'plain meaning' to a contract or whether an ambiguity exists is a legal question also subject to *de novo* interpretation." *Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996).

The parties agree the Termination Agreement is governed by New York law. Under New York law, "agreements are construed in accord with the parties' intent." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (quotation marks and citations omitted). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* Ambiguity, though, allows use of parol evidence. *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). "[T]he resolution of [such] ambiguity is for the trier of fact." *Global Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 95 (2d Cir. 2021) (quotation marks and citation omitted).

First, Inmarsat argues the lower courts erred in concluding the claim unambiguously is not a Permitted Claim. Second, Inmarsat contends the district court erred in holding that, even if the definition of a Permitted Claim is ambiguous, extrinsic evidence shows the parties intended for the Termination Agreement to release all Shortfall Amount obligations.

To understand how the Termination Agreement affected the Shortfall Amount payments, we begin by examining the four corners of the agreement and determining if there is clarity or ambiguity.

The Termination Agreement provides that "each Existing Agreement is terminated in full" as of the Effective Date — January 1, 2021. Further, neither party "will have any further rights or obligations under any Existing Agreement." Additionally, Inmarsat agreed to "absolutely, irrevocably and unconditionally forever release and discharge" Speedcast from "any

Released Claims . . . arising out of or relating to" the Existing Agreements or Surviving Agreement, "whether arising prior to, on or after" the Effective Date. "Released Claims" are defined as "other than the Permitted Claims, any and all claims, actions, [or] causes of action . . . existing at any time, whether asserted or unasserted at the Effective Date."

Obviously, if Inmarsat's claim for the Shortfall Amount is not a Permitted Claim, it is released. The Termination Agreement defines Permitted Claims as "claims for payment . . . for *services delivered* . . . under, and otherwise on the terms of, any Existing Agreement or the Surviving Agreement." (emphasis added). The FX services were delivered under the MSAs; pricing and payment terms for those deliveries were modified by the SAA; and both the SAA and the MSAs are Existing Agreements under the Termination Agreement. Speedcast maintains the district court correctly concluded Inmarsat's claim does not fit into the definition of a Permitted Claim because the claim was not for services delivered.

The dispute on appeal does not include that Speedcast was obligated to pay for services Inmarsat delivered under one agreement and "otherwise on the terms of" another. In fact, the bankruptcy court approved, and Speedcast paid, an administrative expense claim for satellite services that Inmarsat delivered to Speedcast "under" the MSAs "and otherwise on the terms of" the SAA, which set the price for those services until it terminated. Speedcast insists those claims fit the definition of Permitted Claims because they were for services Inmarsat *actually delivered*, which is not the case with the claim for the Shortfall Amount.

The district court stated that "[t]he Shortfall Amount is not for 'services delivered.'" Instead, it was "a penalty for services that Inmarsat did not deliver to Speedcast, because Speedcast was unable to find enough purchasers for those services." Speedcast adopts the district court's reasoning,

arguing that the ordinary meaning of a payment "for" services delivered is a payment that is due "on account of" delivery of those services. *See Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998).

According to Speedcast, the Shortfall Amount penalty is imposed "[i]f Speedcast does not meet its Minimum RGU Commitment," *i.e.*, if Speedcast does *not* deliver services to as many customers as it promised. Accordingly, Speedcast asserts that amount unambiguously falls outside the scope of a Permitted Claim, which is one for the provision of "services" (not customers), and they must be provided by Inmarsat to Speedcast, not the other way around. In other words, Speedcast contends the "penalty" applies because Speedcast was unable to find enough purchasers for its services and thus cannot be a payment for "services delivered."

Inmarsat counters that its claim for the Shortfall Amount is for payment due "for services delivered" because the SAA makes clear that any Shortfall Amount is a critical component of the price of the FX services that Inmarsat actually delivered to Speedcast. Inmarsat agreed to provide a discount "in exchange for" Speedcast agreeing to provide a minimum level of customers or to pay the Shortfall Amount. Inmarsat avers the SAA repeatedly ties the Minimum RGU Commitment to the discounted pricing terms of the contract, evidencing the RGU Commitment is the price/payment for the delivery of services.[2]

---

[2] For instance, in Paragraph 2.2, the SAA provides that, in order to "facilitate" the objectives of the SAA set forth in Paragraph 2.1, the parties agree that "Inmarsat will offer Speedcast special FX/GX pricing and terms, for a five (5) year incentive plan detailed in Schedule A (FX/GX Pricing and Alignment)." In the next sentence, Paragraph 2.2 provides, "Speedcast will make a Minimum RGU Commitment over the five (5) year period from 01 January 2017, as detailed in Schedule A." Under Section A.1 of Schedule A, titled "Pricing Principles," the contract provides that the 30% discount is explicitly

We find Inmarsat's pricing argument unpersuasive. The Shortfall Amount is not a payment for services delivered by Inmarsat to Speedcast. The SAA provides that the Shortfall Amount is part of the performance that Speedcast promised "[i]n exchange for" Inmarsat agreeing to grant a 30% discount. The Shortfall Amount in turn is not levied on the services that Inmarsat delivered to Speedcast; it is levied due to the customers Speedcast failed to provide.

Therefore, we find that the Termination Agreement's definition of Permitted Claims unambiguously requires (1) a claim for payment, (2) by Inmarsat, (3) for services delivered, (4) by Inmarsat to Speedcast. Inmarsat's claim for the Shortfall Amount did not satisfy the third and fourth requirements.

We hold that the Termination Agreement's definitions of Released Claims and Permitted Claims are unambiguous. Consequently, we need not consider any extrinsic evidence. *See Schron*, 20 N.Y.3d at 436.

AFFIRMED.

---

offered "[i]n exchange for Speedcast's Minimum RGU [revenue] Commitment" — *i.e.*, the Shortfall Amount guarantee.