■ MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Appellant, v GRAMERCY TWINS ASSOCIATES, Respondent, et al., Defendants. [606 NYS2d 158] —Order, Supreme Court, New York County (Carol H. Arber, J.), entered on or about April 14, 1993, which denied plaintiff's motion for summary judgment, unanimously reversed, on the law, with costs, and summary judgment of foreclosure in favor of plaintiff is granted.

On April 19, 1990, defendant Gramercy Twins Associates executed a non-recourse consolidated note evidencing indebtedness of $1.7 million to plaintiff Massachusetts Mutual Life Insurance Company, secured by a consolidated first mortgage on premises located at 33-39 East 21st Street in Manhattan, as well as a $500,000 letter of credit. Due to adverse economic conditions, including a declaration of bankruptcy by a major tenant, the property failed to generate sufficient income to meet operating expenses. On defendant's default in the payment of taxes, insurance, and principal and income, plaintiff served a notice dated January 29, 1992 upon Gramercy that the entire indebtedness was being accelerated.

It is not denied that defendant and plaintiff began protracted negotiations concerning a possible modification of the mortgage. According to defendant, based on assurances from plaintiff's vice president, Victor Woolridge, that plaintiff would work with defendant in an attempt to restructure the loan, defendant gave plaintiff access to its records, incurred expenses to improve the premises, and executed an in rem agreement to pay past due real estate taxes to the City. Defendant concedes that all written communications from the plaintiff contained the usual and requisite disclaimers, but maintains that it received oral assurances that plaintiff would negotiate in good faith to restructure the indebtedness.

Specifically, defendant's general partner Michael Kornblum alleged that on January 15, 1992, he met with Mr. Woolridge, inspected the building with him, furnished him with financial data, and requested a loan modification. Plaintiff accelerated the debt by letter dated January 29, 1992 as noted above. Defendant made a partial payment of principal and interest in January, which was rejected. In February, defendant kept plaintiff apprised of the financial status and condition of the building, providing plaintiff with a copy of the proposed in rem agreement and other documents pertaining to the cash flow generated by the building.

Defendant concedes that on March 16, 1992, plaintiff clearly advised defendant that plaintiff "would not consider forbearance until an acceptable cash management and cash collateral agreement had been established." Further, the City had imposed a deadline of May 15 for executing the in rem agreement. Defendant allegedly sought assurances from Woolridge's superior, Mr. Dudley, that plaintiff was serious in its intent to modify the loan as opposed to commencing foreclosure. According to defendant, "Dudley was clear in assuring us that plaintiff wanted to proceed with a loan modification rather than foreclosure and urged us to complete negotiations with Woolridge."

On May 11, Woolridge allegedly "pledged" $217,000 from the $500,000 letter of credit for three of the quarterly payments which would be due under the in rem agreement. Defendant maintains that its execution of the in rem agreement with the City was based on plaintiff's assurances that it would pledge monies toward the payments, and that it would continue to negotiate toward a loan modification. On June 17, plaintiff's attorneys furnished defendant's counsel with a proposed standstill agreement. According to plaintiff, defendant was unwilling to execute the standstill agreement on the

grounds that it required a payment of $154,451, that it required defendant to admit its defaults under the mortgage, and that plaintiff would not assume defendant's liability under the in rem agreement.

According to plaintiff, it was clear as of June 25 that defendant would not execute the proposed standstill agreement, and thus there would be no loan modification. On July 1, 1992, plaintiff withdrew its prior notice accelerating the mortgage due to the execution of the in rem agreement, but simultaneously declared a default due to the failure to pay principal and interest from January of that year. There was no response to this letter. By letter dated July 20, 1992, the balance of the indebtedness was again accelerated. On July 22, 1992, this action was commenced.

Plaintiff moved for summary judgment. In opposition, defendant asserted that it had paid the City taxes, and assumed a personal obligation which did not previously exist, in reliance on plaintiff's agreement to negotiate in good faith toward a restructuring of the indebtedness. Defendant further asserted that it had expended $400,000 in capital improvements, paid brokerage fees to secure new tenants, given access to the premises and its books, all in reliance on assurances that a modification would be negotiated.

The IAS Court held, in pertinent part: "The facts asserted here indicate that the parties began discussions and negotiations from October 1991 to July 1992 when plaintiff filed suit. During the period of almost one year, defendant asserts that many actions were taken in reliance on plaintiff's good faith in its efforts to reach agreement as to a mutually satisfactory modification. These allegations along with the length of the period of negotiation create issues of fact as to whether there was a waiver or estoppel."

Defendant argues that an estoppel lies where "a mortgagee makes promises in bad faith, on which the mortgagor relies to his or her detriment, the mortgagee can be equitably estopped from foreclosing on the mortgage." *(Friesch-Groningsche Hypotheekbank Realty Corp. v Ward Equities,* 188 AD2d 397, 398; *Nassau Trust Co. v Montrose Concrete Prods. Corp.,* 56 NY2d 175.)* Defendant argues that the same facts support a finding of waiver as well *(Nassau Trust Co. v Montrose Concrete Prods. Corp., supra).*

In *Nassau Trust,* an action to foreclose a mortgage, defendant's *unrefuted* submissions alleged that plaintiff's loan officers had advised the mortgagor that the default under the

mortgage was waived for one year pending an anticipated sale of the premises in an amount sufficient to satisfy the mortgage. The Court observed that the defenses of estoppel and waiver required no writing or consideration, and that "[w]hile estoppel requires detriment to the party claiming to have been misled, waiver requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable [citations omitted]." (56 NY2d, *supra,* at 184.) The Court found the unrefuted allegations sufficient to require a trial.

Here, it is not alleged that plaintiff provided a specific, identifiable promise not to proceed with the foreclosure. Rather, after setting forth a one-sided version of the facts, defendant relied on the vague and unspecific promise that plaintiff would *negotiate* toward the consummation of a restructured mortgage. The short answer to defendant's purported defense is that plaintiff did negotiate toward that end, during at least seven months, and that the amount of the arrears rose to over $1 million during that time.

Defendant alleged that plaintiff agreed to negotiate. The promise to negotiate cannot be equated with a promise to finalize an agreement on a restructured mortgage. *The parties never had more than an agreement to agree.* The plaintiff never waived its right to commence a foreclosure, even crediting the oral assurances attributed to plaintiff's agents, beyond the time that negotiations actually continued. It was at all times within plaintiff's power to cease negotiations.

The attempt by defendant to suggest that plaintiff proceeded in bad faith fails. If defendant incurred additional obligations in an attempt to avoid foreclosure and restructure the mortgage, nevertheless, by the same token, defendant stood to gain if its plan succeeded. Any supposed advantage to plaintiff resulting from defendant's undertaking to pay the tax arrears was lost by virtue of the fact that defendant used the funds generated by the premises to pay the tax arrears, while at the same time the principal and interest payments fell into default. Further, defendant studiously avoids addressing the details of the breakdown in negotiations, which may justly be attributed to defendant's refusal to execute the standstill agreement.

All that plaintiff promised defendant was an opportunity to negotiate a settlement. The bargain was fulfilled. The record lacks evidence that plaintiff proceeded in bad faith, or secured a collateral advantage as a result of the delay in commencing the foreclosure. Defendant did enjoy an appreciable delay in

the commencement of the foreclosure action. Indeed, it was illogical for the IAS Court to draw a negative inference from the fact that plaintiff kept the negotiations open as long as it did. The length of time accorded defendant to work out its financial difficulties, if anything, is evidence of plaintiff's good faith. *(See,* critical discussion of IAS Court's decision in Bergman, Mortgage Foreclosures, *Killed by Kindness, The Perils of the Long, Drawn Out Settlement Discussion,* NYLJ, Oct. 13, 1993, at 5, col 2.) The fact that those negotiations ultimately failed is not significant, as plaintiff never, even according to defendant's allegations, promised unconditionally to restructure the mortgage—a promise which in any event would have been so commercially foolhardy as to be incredible on its face.

Whatever actions the defendant undertook to forestall foreclosure, it undertook at its own risk. Accordingly the order appealed from must be reversed, and summary judgment granted in favor of plaintiff. Concur—Carro, J. P., Rosenberger, Kassal and Rubin, JJ.