U.S. Bank N.A. v GreenPoint Mtge. Funding, Inc. (2017 NY Slip Op 08644)





U.S. Bank N.A. v GreenPoint Mtge. Funding, Inc.


2017 NY Slip Op 08644


Decided on December 12, 2017


Appellate Division, First Department


Moskowitz, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 12, 2017
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Karla Moskowitz
Judith J. Gische
Marcy L. Kahn, JJ.


600352/09 

[*1]U.S. Bank National Association, etc., Plaintiff-Respondent,
v
GreenPoint Mortgage Funding, Inc., Defendant-Appellant. 
Syncora Guarantee Inc., etc., Nonparty Respondent.



Defendant appeals from the orders of the Supreme Court, New York County (Marcy S. Friedman, J.), entered January 28, 2016, which, to the extent appealed from, granted plaintiff's motion for summary judgment dismissing the defense of lack of standing, and denied defendant's motion for summary judgment dismissing the complaint for lack of standing.




Murphy & McGonigle, P.C., New York (James A. Murphy of counsel), for appellant.
Allegaert Berger & Vogel LLP, New York (Michael S. Vogel, David A. Berger, Kevin L. MacMillan, John Craig and Lauren J. Pincus of counsel), and Quinn Emanuel Urquhart & Sullivan, LLP, New York (Philippe Z. Selendy, Andrew R. Dunlap, Sean P. Baldwin and Yalena Konanova of counsel), for U.S. Bank National Association, respondent.
Allegaert Berger & Vogel LLP, New York (Michael S. Vogel, David A. Berger, John S. Craig and Lauren S. Pincus of counsel), for Syncora Guarantee Inc., respondent.



MOSKOWITZ, J.


In this appeal, we are asked to decide whether plaintiff U.S. Bank National Association may pursue its claims for breach of contract against defendant (GreenPoint). We find that [*2]although the relevant contracts are unambiguous, the record presents an issue of fact as to whether U.S. Bank has standing to sue under the HELOC (home equity lines of credit) agreements. The record demonstrates as a matter of law, however, that U.S. Bank does not have standing to sue under the CES (closed-end seconds) agreement.
The Background to the Litigation
GreenPoint was in the business of originating, acquiring, and selling residential mortgage loans; it also sold loans to financial institutions for securitization. Between September 2005 and July 2006, GreenPoint sold multiple pools of loans as part of a $1.83 billion securitization; in connection with that securitization, GreenPoint Mortgage Fund Trust 2006-HE1 (the Trust) issued Home Equity Loan Asset-Backed Notes, Series 2006-HE1 (the notes). The notes are residential mortgage-backed securities backed by the 30,000 residential mortgage loans that GreenPoint had originated.
In general, sales of loans involved two types of contracts, a flow agreement and a purchase price and term letter (PPTL). Initially, to govern the general structure of the transfer, GreenPoint entered into flow agreements, general agreements setting forth GreenPoint's loan warranties and agreement to repurchase loans that materially breached the warranties. The flow agreements, however, did not actually effectuate any loan sales. Rather, to actually sell the loans, GreenPoint entered into the second type of contract — namely, the PPTL. The PPTLs supplied specific terms governing individual trades under the flow agreements — for example, the price and anticipated closing date for the particular trade.
In a PPTL from nonparty Lehman Brothers Bank, FSB (Lehman Bank), dated as of September 12, 2005, Lehman Bank agreed to buy home equity lines of credit (HELOC) from GreenPoint. The letter agreement referenced another contract to be concluded in the future — specifically, a HELOC Revolving Credit Loan Flow Purchase and Sale Agreement between GreenPoint and Lehman Bank that was to be (and was in fact) dated as of September 26, 2005.
GreenPoint and Lehman Bank conducted the sale of loans through an intermediary, nonparty GMAC Mortgage Corporation. GreenPoint as "Seller" and GMAC as "Purchaser" entered into two types of flow agreements. The first agreement was a "Flow Revolving Credit Loan Purchase and Warranties Agreement" for the sale of HELOCs (the HELOC flow agreement). The second agreement was a "Flow Mortgage Loan Purchase and Warranties Agreement" for the sale of "closed-end second" (CES) lien loans (the CES flow agreement).[FN1]
The two flow agreements contained loan representations and warranties. GreenPoint also agreed to repurchase, "at the Purchaser's option," any loan that materially and adversely breached the representations and warranties, and, under some circumstances, all loans sold under the flow agreements. Both the HELOC and CES flow agreements contained provisions permitting GMAC to assign the loans, including its repurchase rights.
Section 21 of the HELOC flow agreement governed assignments and stated that the flow agreement was to inure to the benefit of, and was to be enforceable by, the successors and assigns of GMAC. Section 21 further stated:
"No transfer of a Revolving Credit Loan may be made unless such transfer is in compliance with the terms hereof. . . . [GMAC] may, subject to the terms of this Agreement, sell and transfer one or more of the Revolving Credit Loans [i.e., HELOCs], provided, however, that (i) in the case of a Securitization Transfer or an Agency Transfer, [GMAC] shall have the right to assign its rights under this [*3]Agreement into such Securitization Transfer or Agency Transfer after which the issuer or trustee for the issuer of any such Securitization Transfer or Agency Transfer shall be deemed to be a Purchaser or (ii) in the case of any sale or transfer other than a Securitization Transfer or an Agency Transfer, any transferee will not be deemed to be a Purchaser hereunder binding upon [GreenPoint] unless such transferee shall agree in writing to be bound by the terms of this Agreement and an original counterpart of the instrument of transfer and an assignment and assumption of this Agreement substantially in the form of Exhibit G hereto executed by the transferee shall have been delivered to [GreenPoint]. [GMAC] also shall advise [GreenPoint] of the transfer" (emphasis added).
The term "Securitization Transfer" is not listed in the definitions section. However, section 28 says that GMAC "may . . . convey the Revolving Credit Loans to securitized trust structures ( Securitization Transfers')."
Section 21 of the CES flow agreement differed from the corresponding section of the HELOC flow agreement. That section in the CES flow agreement provided in pertinent part that GMAC
"may . . . sell and transfer one or more of the Mortgage Loans, provided, however, that the transferee will not be deemed to be a Purchaser . . . unless such transferee shall agree in writing to be bound by the terms of this Agreement[,] and an original counterpart of the instrument of transfer and an assignment and assumption of this Agreement in the form of Exhibit H hereto executed by the transferee shall have been delivered to [GreenPoint]."
Notably, the CES flow agreement, in contrast with the HELOC flow agreement, did not contain any exception for a securitization transfer. In addition, the CES flow agreement required that the transfer had to be "in the form of Exhibit H," not "substantially in the form" of that exhibit.
As noted above, GreenPoint sold the loans, along with the loan servicing obligations, to GMAC as the nominal purchaser. On the same day that the HELOC sale closed, GMAC, Lehman Bank, and GreenPoint entered an "Assignment, Assumption and Recognition Agreement" (AAR) renaming Lehman Bank as the purchaser but leaving the servicing obligations with GMAC.
Lehman Bank, by way of GMAC, acquired a series of loans in trades occurring between September 2005 and August 2006; each trade had its own PPTL, so that there were five PPTLs. Four of the PPTLs, dated as of September 12, 2005, March 7, 2006, March 25, 2006, and April 19, 2006, sold HELOCs. The fifth PPTL, dated as of July 11, 2006, sold both HELOCs and CES loans. The PPTLs gave Lehman Bank the right to assign its rights under the flow agreements. The PPTL dated July 11, 2006 stated:
"The Purchaser [Lehman Bank] has the right to assign all of its rights under the Purchase Price and Terms Letter, the [HELOC Flow] Agreement, the [CES Flow Agreement], the HELOC Interim Servicing Agreement, the Mortgage Loan Interim Servicing Agreement and/or any of the HELOCs/Mortgage Loans purchased under this Purchase Transaction to any affiliate of the Purchaser or third party."[FN2]
Moreover, each HELOC PPTL stated that Lehman Bank "may sell the HELOCs either to whole loan purchasers . . . exchange the HELOCs for agency securities . . . or convey the HELOCs to [*4]securitized trust structures."
In connection with each loan purchase, GMAC, Lehman Bank, and GreenPoint entered into at least one AAR. In the AARs, GMAC assigned all of its rights as "Purchaser" under the HELOC Flow Agreement, except for servicing rights, to Lehman Bank. Moreover, GreenPoint agreed that Lehman Bank would become the "Purchaser" under the HELOC flow agreement, and all of GreenPoint's representations and warranties as the Seller, including the representations, warranties and covenants to repurchase any mortgage loan, would accrue to Lehman Bank under the AAR. GMAC, Lehman Bank, and GreenPoint later entered into AARs for the four additional batches of HELOCs; these AARs contained the same language as the September 29, 2005 AAR.
In early August 2006, by way of an Assignment and Assumption Agreement dated August 1, 2006, Lehman Bank assigned "all of its right, title[,] and interest in and to the Loans and the Sale/Servicing Agreements," including the two flow agreements, to Lehman Brothers Holdings. GreenPoint was not a signatory to this agreement, and the assignment did not use the assignment agreement language specified in the two flow agreements. Nor was it "substantially in the form of" Exhibit G or H.
Next, Lehman Holdings and nonparty Structured Assets Securities Corporation (SASCO) entered into a sale and assignment agreement as of August 1, 2006. In that agreement, Lehman Holdings assigned to SASCO all of its rights under the Assignment and Assumption Agreement. SASCO then transferred the underlying loans to the Trust, of which U.S. Bank was the trustee, to effect the securitiziation. GreenPoint was not a signatory to any of those assignments.
The Events Leading to the Litigation
In early 2008, an insurer of the securitization notified U.S. Bank that 963 of the loans did not comply with GreenPoint's representations and warranties. Accordingly, in March 2008, U.S. Bank notified GreenPoint of breaches of several of its representations and warranties with respect to approximately 655 loans. U.S. Bank requested that GreenPoint either cure the breaches or repurchase the allegedly breaching loans.
GreenPoint rejected the request, taking the position that U.S. Bank had not satisfied the express conditions required for it to sue GreenPoint for the repurchase of loans. Specifically, GreenPoint argued that U.S. Bank had not received a valid assignment of Lehman Bank's rights to enforce the flow agreements' remedies for breaches of loan representations and warranties.
In February 2009, U.S. Bank, along with two other entities who are not parties to this appeal, commenced this action [FN3]. They asserted two causes of action for breach of contract, seeking specific performance and damages. Greenpoint asserted the affirmative defense that U.S. Bank lacked standing because the rights of a purchaser had not properly been assigned to it.
U.S. Bank moved for partial summary judgment dismissing the affirmative defense of lack of standing, and GreenPoint moved for summary judgment dismissing the complaint on the ground that U.S. Bank lacked standing. The motion court granted U.S. Bank's motion, and denied GreenPoint's motion.
Analysis
To begin, we agree with the motion court that the relevant agreements, considered together, are unambiguous in their requirement that a particular form be used to effect the [*5]assignment of Lehman Bank's rights as a purchaser. Indeed, the flow agreements plainly stated that if the stated conditions were not satisfied, then the "transferee will not be deemed to be a Purchaser hereunder binding upon [GreenPoint]." Therefore, extrinsic evidence may not be considered to glean the parties' intent (see e.g. Greenfield v Philles Records, 98 NY2d 562, 569 [2002]; Waverly Corp. v City of New York, 48 AD3d 261, 265 [1st Dept 2008]).
Nonetheless, the court held that Lehman Bank was not required to use an assignment form to transfer the loans and its purchase rights under the flow agreements to Lehman Holdings. The court found that, while the CES flow agreement required use of Exhibit H and the HELOC flow agreement required the assignment to be made in "substantially the same form" as Exhibit G unless the assignment of rights was made in a "securitization transfer," the PPTLs expressly authorized Lehman Bank to assign all of its rights under the flow agreements, without limitation, to an affiliate or third party, and did not require use of a specified form to effect an assignment. Thus, the court found that U.S. Bank had standing to bring this suit, and dismissed GreenPoint's affirmative defense alleging lack of standing.
This finding was error. First, no inconsistency exists between the PPTLs and the flow agreements. In fact, the PPTLs expressly anticipated the execution of a flow agreement to govern the transaction; the flow agreement was to supply the loan representations and warranties and establish who could enforce remedies for loans that breached these representations and warranties. Notably, Lehman Bank did not acquire any loans until after the parties had signed the flow agreement. Moreover, the PPTL specified that the closing documents for the trade would include the flow agreement and its exhibits. Accordingly, Exhibits G and H, attached to and made a part of the flow agreements, provided the required assignment agreement language necessary to convey the status of purchaser.
Second, giving precedence to the PPTLs over the flow agreements, renders meaningless section 21 — the section governing assignments — of each flow agreement. In interpreting a contract a court should favor an interpretation that gives effect to all the terms of an agreement rather than ignoring terms or interpreting them unreasonably (see e.g. Perlbinder v Board of Mgrs. of 411 E. 53rd St. Condominium, 65 AD3d 985, 986—87 [internal quotation marks omitted] [1st Dept 2009]). Indeed, "where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect" (id. at 987; see also Lenart Realty Corp. v Petroleum Tank Cleaners, Ltd., 116 AD3d 536, 537 [1st Dept 2014]). We have also found that "agreements executed at substantially the same time and related to the same subject matter are regarded as contemporaneous writings and must be read together as one" (Perlbinder, 65 AD3d at 987 [internal quotation marks omitted]). Thus, in failing to harmonize the PPTL and the flow agreement, the motion court essentially read the flow agreement terms out of existence.
What is more, the court's finding otherwise notwithstanding, there is no inconsistency between the assignment provisions of the PPTLs and those in the flow agreements. Rather, the letter agreements state the purchaser's right to assign, and the flow agreements specify how the purchaser is to exercise that right (see generally Lenart Realty, 116 AD3d at 537; Trade Bank & Trust Co. v Goldberg, 38 AD2d 405, 406 [1st Dept 1972])[FN4]. Our interpretation of the flow agreement's applicability, however, does not fully resolve the standing issue, because, as noted, there still exists an issue of fact as to whether the relevant transfer was a securitization transfer.
As to the CES flow agreement, that document contains no exception for a securitization [*6]transfer. Although the AAR transferred GMAC's rights as purchaser under the CES flow agreement, GreenPoint cannot object to this transfer because it expressly consented to it. But Greenpoint was not a party to any of the later transfers of the CES flow agreement. In addition, the CES flow agreement requires the transfer to be "in the form of Exhibit H," not "substantially in the form of" that exhibit, and neither party disputes that the relevant transfers were not in the form of Exhibit H. Thus, U.S. Bank does not have standing to sue with respect to the CES flow agreement.
U.S. Bank argues that we should affirm the motion court's decision on three alternative grounds — namely, equitable estoppel, waiver, and modification. We reject all of these arguments. With respect to equitable estoppel, U.S. Bank argues that GreenPoint should be equitably estopped from arguing that its representations and warranties were not properly assigned to U.S. Bank. This argument fails for lack of justifiable reliance (see e.g. Sisler v Security Pac. Bus. Credit, 201 AD2d 216, 222 [1st Dept 1994], lv dismissed 84 NY2d 978 [1994]). Likewise, U.S. Bank's waiver argument fails for lack of evidence that defendant "provided a specific, identifiable promise not to" require compliance with the Flow Agreements (Massachusetts Mut. Life Ins. Co. v Gramercy Twins Assoc., 199 AD2d 214, 217 [1st Dept 1993]). Last, the modification argument, which is based on a theory of partial performance, fails because, for this argument to succeed, the acts of part performance must have been those of the party insisting on the oral contract — in this case, U.S. Bank. But the acts that U.S. Bank alleges to have modified the contract are GreenPoint's, not U.S. Bank's. Additionally, the acts U.S. Bank alleges are not "unequivocally referable to the alleged oral agreement," as is necessary for a modification argument to succeed (see Richardson & Lucas, Inc. v New York Athletic Club of City of N.Y., 304 AD2d 462, 463 [1st Dept 2003][internal quotation marks omitted]).
Finally, because the motion court found that Lehman Bank was not required to use an assignment form to transfer to Lehman Holdings the loans and purchaser rights under the flow agreements, the court declined to reach the issue of whether the relevant transfer was a "securitization transfer" within the meaning of the HELOC flow agreement. With respect to this question, we find that an issue of fact exists. The HELOC flow agreement does not require an assignment substantially in the form of Exhibit G if the sale and transfer is a securitization transfer. It appears that the documents underlying the transfer were not substantially in the form of Exhibit G. As to whether a securitization transfer occurred, each party supported its position with affidavits by well-credentialed experts, and each expert's opinion has some support in the record. Accordingly, it cannot be determined as a matter of law whether the HELOC assignments were securitization transfers not requiring compliance with section 21 of the flow agreement.
Accordingly, the orders of the Supreme Court, New York County (Marcy S. Friedman, J.), entered January 28, 2016, which, to the extent appealed from, granted plaintiff U.S. Bank National Association's motion for summary judgment dismissing the defense of lack of standing, and denied defendant's motion for summary judgment dismissing the complaint for lack of [*7]standing, should be modified, on the law, to deny U.S. Bank's motion and to grant defendant's motion as to so much of the complaint as is based on closed-end seconds, and otherwise affirmed, without costs.
All concur.
Orders, Supreme Court, New York County (Marcy S. Friedman, J.), entered January 28, 2016, modified, on the law, to deny U.S. Bank National Association's motion and to grant defendant's motion as to so much of the complaint as is based on closed-end seconds, and otherwise affirmed, without costs.
Opinion by Moskowitz, J. All concur.
Friedman, J.P., Moskowitz, Gische, Kahn, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 12, 2017
CLERK



Footnotes

Footnote 1: CES loans differ from HELOCs in that, under a CES, the mortgagor borrows a one-time fixed amount rather than obtaining a line of credit.

Footnote 2: As the motion court noted, the parties do not argue that the provisions of the five PPTLs are materially different from one another.

Footnote 3: The other plaintiffs were Syncora Guarantee Inc. and CIFG Assurance North America, Inc. In 2012, the motion court granted GreenPoint's motion to dismiss Syncora and CIFG's claims against it, and we affirmed that order (U.S. Bank N.A. v GreenPoint Mrtge. Funding, Inc., 105 AD3d 639 [1st Dept 2013], lv denied, 22 NY3d 863 [2014]).

Footnote 4: Even had the PPTLs been silent, the purchaser would have had the right to assign (see Ellington v Sony/ATV Music Publ. LLC, 85 AD3d 438, 439 [1st Dept 2011]).